In re JOSHUA SLOCUM, LTD., a Delaware Corporation Debtor.

In re JOSHUA SLOCUM, LTD., a Pennsylvania Corporation Debtor.

Bankruptcy Nos. 88–14082S, 88–14083S.

United States Bankruptcy Court, E.D. Pennsylvania.

March 29, 1989.

See also, Bkrtcy., 99 B.R. 261.

Melvin Lashner, J. Scott Victor, Philadelphia, Pa., Trustee.

James W. Adelman, Philadelphia, Pa., for Creditors' Committee.

Marilyn Simon, New York City, for European Collections, Inc.

Robert Burrick, Warshaw, Burnstein, Cohen, Schlesinger & Kuh, New York City, for debtor.

James J. O'Connell, Asst. U.S. Trustee, Philadelphia, Pa.

Jacob A. Manheimer, Pierce, Atwood, Schribner, Alalen, Smith & Lancaster, Portland, Me., for George Denney.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

### A. INTRODUCTION

■ The instant motion of the Trustee to allow the Debtor to assume and assign one of its store leases raises several issues of first impression in this jurisdiction regarding the limitations imposed upon such assignments by restrictive clauses contained in the Debtor's lease. We hold that, unless the landlord establishes that the leasehold is in a "shopping center," restrictive clauses can be enforced only if the landlord is able to establish that such terms are material and jeopardize the economic position of the landlord and/or the landlord's other tenants.

We find that the landlord in question has not met his burden of proving that the store in question is in a "shopping center." We further hold that the landlord has not met its burden of proving that any of the restrictive clause in issue—regarding the general use of the premises, prohibiting "fire sales" and "black outs," and allowing termination of the lease for failure to realize certain minimum sales figures—are material and economically jeopardize him or his other tenants. Finding that the proposed assignee of the Debtors' lease is otherwise capable of providing adequate assurance of performance of all material and enforceable lease requirements, we will grant the Trustee's motion.

### B. PROCEDURAL HISTORY

On November 21, 1988, the related Debtors, JOSHUA SLOCUM, LTD., a Pennsylvania Corporation; and JOSHUA SLOCUM, LTD., a Delaware Corporation (herein referred to collectively as "the Debtor"), filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code. Prior to its filing, the Debtor, originally an offshoot of J.G. Hook, Inc. (hereinafter "Hook"), a manufacturer of women's clothing, had operated a chain of retail stores located in several cities in the eastern United States, selling women's apparel in stores named "Post Horn" or "Sparrs." Accordingly, the Debtor had entered into numerous nonresidential real estate leases from which it conducted its retail operations. Many of the Debtor's leases were in commercially favorable locations, were long-term (ten (10) years or more), and contained reasonable rental rates. As such, they were a substantial asset of the Debtor's estate.

After initially attempting to continue operations, the Debtor, by December, 1988, realized that its only recourse was liquidation of all of its assets. On January 4, 1989, spirited bidding to purchase the Debtor's inventory led to a sale of same to E.K. of New York, Inc. (hereinafter "EK"), for $1,020,000. EK expressed an intention to utilize certain of the Debtor's stores to conduct its liquidation sales. All of the Debtor's landlords were notified of the proceedings on the liquidation of the inventory and several appeared and had input on the terms under which EK's liquidation sales were to be conducted. To date, no disputes appear to have arisen from this phase of the case. We memorialized the sale to EK in an Order of January 5, 1989.

After reaching an agreement to liquidate its inventory, the Debtor's next efforts were to sell or assign as many of its leases as it could. The Debtor filed a timely motion to extend the time to assume or reject all of its leases on January 12, 1989. *See In re Garrett Road Supermarket, Inc.*, 89 B.R. 514, 518–19 (Bankr.E.D.Pa. 1988), *aff'd*, 95 B.R. 902 (E.D.Pa.1989) (the filing of a motion to extend the time to assume or reject a lease within the 60–day period after the bankruptcy filing satisfies the time stricture of 11 U.S.C. § 365(d)(4) even if the court does not rule on the motion until after the 60–day period has expired). However, on that date, the United States Trustee also filed a motion to appoint a Trustee or convert the case to Chapter 7. The Debtor ultimately consented to appointment of a Trustee, and, on February 16, 1989, Melvin Lashner, Esquire, was appointed as Trustee, apparently pursuant to 11 U.S.C. § 1104(a)(2).

On February 24, 1989, the Trustee filed expedited motions to assume and assign seventeen (17) of the Debtor's leases, recit-

ing the highest bid for each which the Debtor's counsel had been able to negotiate. The hearings on these motions were scheduled on March 8, 1989. Consolidated with these hearings was an Objection by one landlord, Prutaub Joint Venture, owner of the Mall at Short Hills, Millburn, New Jersey, to the extension of the time to assume or reject its lease. After several hours of private discussion among the Trustee, the assembled retailer bidders, the assembled landlords, and other interested parties, and a lengthy discussion on the record thereafter on March 8, 1989, the Trustee announced that open bidding would take place as to nine (9) of the leases, for which bids higher than those previously negotiated by the Debtor's counsel had been tendered. The bids realized on the leases under consideration totalled approximately $600,000.00.

One of the leases that was subject to bids at the March 8, 1989, hearing was the Debtor's "Lease for Denney Block Freeport, Maine" (hereinafter "the Lease"), dated May 19, 1983, and extending for a term of ten (10) years. At the outset, a dispute arose regarding the enforceability of paragraph 20 of the Lease, quoted at page 253 *infra*. The Trustee announced that he believed this paragraph to be unenforceable as to any successful bidder and assured the bidders that, if he were in error as to this assertion, he would release the successful bidder from the bid.

The Trustee then auctioned this leasehold interest and, after spirited bidding, it was knocked down to European Collections, Inc. (hereinafter "EC"), for $77,000.00. It should be noted that this was the highest bid received for any of the Debtor's leaseholds in the sales of that date.

We then scheduled a hearing on the Objections of George Denney (hereinafter "Denney"), the owner of the Freeport location, to assignment of the Debtor's lease to EC on March 13, 1989, with hearings on Objections by two other landlords to the Debtor's assignment of their leases to EC. As it developed, EC resolved matters with the other two landlords, one by deciding not to proceed to accept the leasehold and the other by apparently satisfying the landlord's reservations to its acceptability as a tenant. The hearing regarding Denney's Objections was continued to and heard by us on March 22, 1989. Having received Memoranda of Law from the Trustee and Denney prior to and at the hearing, respectively, we were urged to render our decision quickly without further submissions.

Called as witnesses at the hearing by the Trustee were Robert Burrick, Esquire, the Debtor's counsel; Richard Woolwine, the Chief Operating Officer of He–Ro Industries, Inc. (hereinafter "He–Ro"), EC's parent corporation; Leonard Blackman, the President of EC, whose previous accomplishments included nineteen (19) years as President and Chief Operating Officer of Korvette's, Inc., formerly a chain of large department stores. Denney was the sole witness on his own behalf.

## C. FACTUAL BACKGROUND

The issues in dispute include the general acceptability of EC as a replacement for the Debtor and the enforceability of the following clauses of the Lease, which constitute, respectively the "general use" clause, the "fire sale" clause, "black out" clause, and "minimum sales" provisions:

The pertinent portions of Paragraph 9(a) ("general use"):

9. *Use of Premises.* (a) It is understood and agreed by Tenant that the Leased Premises shall be used and occupied by Tenant only for the purpose of the sale of men's and women's apparel, fabrics and related accessory items other than shoes with the exception of one line of canvas top espradrills. It is understood and agreed by Tenant that Tenant shall not use and occupy the Leased Premises for the purpose of the sale of sheepskin jackets, sheepskin coats, and sheepskin accessory items or the sale of shoes other than one line of canvas top espradrills....

Paragraph 9(b)(1) ("fire sale"):

Tenant further agrees to conform to the following provisions during the entire term of this Lease: ... (2) No

auction, so-called "going out of business", fire, or bankruptcy sales may be conducted within the Leased Premises without the prior written consent of Landlord; ...

Paragraph 9(b)(7) ("black out"):

Tenant further agrees to conform to the following provisions during the entire term of this Lease: ... (7) The Leased Premises shall be kept open for business a minimum of six (6) hours each day, seven (7) days a week; ...

Paragraph 20 ("minimum sales"):

*Option to Terminate.* In the event that Tenant's gross sales for the first three (3) lease-years of the term of this Lease do not average at lease Six Hundred Thousand Seven Hundred Fifty and 009/100 Dollars ($602,750.00) per lease-year, either Landlord or Tenant may elect to terminate this Lease; and in the event that Tenant's gross sales for the first six (6) lease-years of the term of this lease do not average Seven Hundred Eleven Thousand Two Hundred Forty Five Dollars and 00/100 Dollars ($711,245.00) per lease-year, either Landlord or Tenant may elect to terminate this Lease. Such election must be made, if at all, by written notice to the other party received within thirty (30) days from the date of receipt by Landlord of the accountant's statement described in Paragraph 4(b) hereinabove; and termination shall become effective ninety (90) days after receipt of such notice....

Burrick recited the history of the case and his role in negotiating the lease assignments. Through his testimony, it came to light that Denney claimed to have been unaware of our Order of January 5, 1989, allowing the sale of the Debtor's inventory to EK. Therefore, when EK advertised a "chain-wide going out of business sale" at the Debtor's Denney Block store on January 19, 1989 (as it was agreed by the landlords present at the January 4, 1989, hearing was permissible), Denney had vigorously objected to this course of conduct as violative of the "fire sale" clause and had filed some sort of matter ancillary to this case in the Bankruptcy Court for the District of Maine. Apparently this matter was withdrawn, but Denney was also dissatisfied with the closing of the "Post Horn" store in the Denney Block by EK on February 20, 1989, claiming that this action was violative of the "black out" clause (although this action was also within the parameters of the agreement with the landlords present on January 4, 1989). Burrick claimed that there were only three stores operating under the name "Post Horn" in the Debtor's chain, all of which were allegedly *not* situated in shopping centers, including the store in issue. The Debtor's other stores, admittedly located *in* shopping centers, operated under the name "Sparrs."

Denney, in his testimony, contended that a large Cole Haan footwear store owned by him and the six (6) adjoining stores making up the Denney Block constituted a "shopping center." He presented the similar, but not identical, leases from each of the Denney Block stores, which included, in addition to the Debtor, Laura Ashley, Inc. (hereinafter "Ashley"); Melru Corp. doing business as Designers Fashion, which were identified as sellers of Jones of New York apparel (hereinafter "Jones"); Cascata Corp. doing business as Benetton (hereinafter "Benetton"); Class Premiums and Incentives, Inc., a perfume store (hereinafter "Class"); and Frederick and Catherine Overkamp and Christmas Magic, Inc., doing business under the latter name (hereinafter "Xmas"). Denney further stated that Cole Haan, as the "anchor store," *i.e.,* the large store in the grouping which purportedly attracts customers to the smaller stores, and the Denney Block stores each fulfilled his concept of confining the Denney Block's tenants to well-known, upscale "company stores," *i.e.,* retailers who manufactured easily-recognizable brand names. When forced to concede that the Debtor, Class, and Xmas did not fit this concept, Denney stated that the latter two establishments were very small stores and hence rather immaterial and that he thought that the Debtor was at all times directly affiliated with Hook, a manufacturer. He admitted

that the management of the Debtor's store had advised him of the post-Lease disaffiliation with Hook, but he believed that, since the management had reassured him that "nothing had changed," the "Post Horn" store continued to be a purveyor of mostly Hook's merchandise. No evidence of how much of Hook's merchandise was actually in this store at any time was produced.

Denney provided no testimony concerning the economic impact of any of the Debtor's lease violations in issue. He stated that the Debtor had met the three lease-years "minimum sales" threshold set forth in paragraph 20. Further, although he was aware that the Debtor was proceeding at a pace below $700,000 gross sales per annum and hence appeared unlikely to meet the six lease-years "minimum sales" threshold, neither he nor the Debtor had indicated any concern or desire to terminate the lease on the basis of this clause prior to the Debtor's bankruptcy filing. Moreover, under our questioning, he admitted that the Jones store had failed to meet its three lease-years "minimum sales" threshold, but the leasehold relationship had been continued without incident. All of the other stores apparently attained their respective "minimum sales" thresholds. A new tenant in the Debtor's store would be compelled to generate about $400,000 gross sales by July, 1989, to meet the six lease-years "minimum sales" threshold for the Debtor's store. The parties all apparently agreed that accomplishing such a volume of sales in this time-frame would be a difficult proposition for any new store.

Woolwine provided a bright financial picture of He–Ro, which was unrebutted and uncontested. He described its several undertakings and components, including a half-ownership of a clothing manufacturer; its original business as a wholesaler and importer for "finer specialty stores;" and its recent opening of two retail operations of its own. Plans for expansion into the retail area had caused it to purchase the store leases at the Debtor's auction sales on March 8, 1989. Woolwine stated that the combined profit of He–Ro's components for the year ending May 31, 1988, was $2.9 million on net income of $52 million.

He–Ro's most notable characteristic was described as an exclusive licensing agreement, through 2002, with Oleg Cassini (hereinafter "Oleg"), which allows it to label its women's clothing with that name. Over half of the merchandise in its retail stores bear the Oleg label, and it claimed to do national advertising of that label and its other labels. Photographs of its other operating retail stores depicted tastefully decorated sales locations stocked with high-quality women's apparel.

Blackman reiterated He–Ro's commitment to selling a high-quality line of clothing, liberally priced, in attractive settings featuring the Oleg name. His experience with Korvette's and a visit to Freeport, Maine, of which he provided us with a "Visitor's Guide" which was admitted as an exhibit, prompted him to conclude that the Denney Block was definitely not a shopping center. Blackman stated that there were four types of recognizable groupings of stores, "strip center," "open mall," "enclosed mall," and "Main St." Only "enclosed malls" and some "open malls" were, in his opinion, "shopping centers." He classified the Denney Block as "Main St." Indeed, the "Visitor's Guide" never uses the term "shopping center" nor does it identify the "Denney Block" per se. It does identify a "Fashion Outlet Mall," which is not the Denney Block. A centerpiece, identified on the map drawing by name, is an L.L. Bean store. The brochure, subtitled "a whimsical guide to some of the Freeport Village Landmarks," communicates to us an attempt to portray Freeport, though located "20 minutes north of Portland," as a "down-home" New England village of quaint, detached specialty stores. Ironically, the Debtor's "Post Horn" store is noted thereon to be located at 58 *Main Street* in Freeport.

## D. STATUTES IN ISSUE

The instant motion involves interpretation of several provisions of 11 U.S.C. § 365, most notably § 365(b) and § 365(f)

which, although lengthy, are reproduced hereinafter in full:

(b)(1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—

(A) cures, or provides adequate assurance that the trustee will promptly cure, such default;

(B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

(C) provides adequate assurance of future performance under such contract or issue.

(2) Paragraph (1) of this subsection does not apply to a default that is a breach of a provision relating to—

(A) the insolvency or financial condition of the debtor at any time before the closing of the case;

(B) the commencement of a case under this title; or

(C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement.

(3) For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

(4) Notwithstanding any other provision of this section, if there has been a default in an unexpired lease of the debtor, other than a default of a kind specified in paragraph (2) of this subsection, the trustee may not require a lessor to provide services or supplies incidental to such lease before assumption of such lease unless the lessor is compensated under the terms of such lease for any services and supplies provided under such lease before assumption of such lease.

.        .        .        .        .

(f)(1) Except as provided in subsection (c)[1] of this section, notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.

(2) The trustee may assign an executory contract or unexpired lease of the debtor only if—

(A) the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B) adequate assurance of future performance by the assignee of such

---

**1.** Subsection (c) excepts "personal performance" contracts, contracts to make loans, and nonresidential realty leases terminated pre-petition.

contract or lease is provided, whether or not there has been a default in such contract or lease.

(3) Notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to·terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee.

### E. THE DENNEY BLOCK IS NOT A "SHOPPING CENTER"

The 1984 amendments to § 365(b), as well as several amendments to § 365(d) of the Bankruptcy Code, were intended to strengthen the protections of the Code to non-residential landlords, particularly those landlords owning shopping centers. *See* 2 COLLIER ON BANKRUPTCY, ¶ 365.03, at 365–30 to 365–32; 365.04[3], at 365–39 at 365–41 & n. 24a (15th ed. 1989). Because of the express statement in § 365(b)(3) that numerous types of very specific lease restrictions are enforceable only as to shopping-center leases, it is very important to determine, at the outset, whether the leasehold in issue is in fact a component of a "shopping center."

█ Collier suggests that "[t]he term 'shopping center' [though] not defined in the Code, ... should be strictly construed." *Id.* ¶ 365.04[2], at 365–39. We agree, and hold that, as a result, the landlord claiming to rent a "shopping center" has the burden of proving same. We are aware of only two cases addressing the issue of what constitutes a "shopping center" for the purposes of § 365(b)(3), *In re Goldblatt Bros., Inc.,* 766 F.2d 1136, 1140–41 (7th Cir.1985); and *In re 905 Int'l Store, Inc.,* 57 B.R. 786, 788–89 (E.D.Mo.1985). Both of these appellate decisions affirm bankruptcy court determinations that the respective premises in question were not in shopping centers.

We further note that both *Goldblatt* and *905 Int'l* involved what Blockman would characterize as "strip centers." Each featured common ownership of several stores, an anchor tenant, joint off-street parking and, in the case of *905 Int'l,* a series of mutually restrictive covenants and common advertising among the tenants. The *Goldblatt* case points to the absence of a "master lease" and "fixed hours" for store-openings as significant findings in support of the bankruptcy court's determination. 776 F.2d at 1141. In *905 Int'l,* the court is impressed with "the absence of contractual interdependence" among the tenants. 57 B.R. at 588.

█ The leases here, though similar, do not appear to be any more interdependent than the *905 Int'l* leases. Furthermore, there is no presence of "joint off-street parking" because the lot behind the Denney Block, although owned by Denney, is public per local ordinance. There is, therefore, considerable doubt whether the contractual configuration of the Denney Block would satisfy the economic requirements for a "shopping center."

However, here, we find that the physical characteristics of the Denney Block preclude its categorization as a "shopping center." A shopping center brings to mind a configuration of stores which are not freestanding or detached in the sense that stores appear in a typical "Main St." downtown shopping district. Such a downtown shopping district is usually considered, in many communities, as the *alternative* to the archetypal "shopping center," i.e., the large enclosed shopping mall. It is apparent to us, from reviewing the Freeport "Visitor's Guide" brochure, that the owners of the Freeport stores are seeking to portray their community as something quite distinct from the concept of a shopping mall. Given Denney's desire to make the Denney Block a conclave of highly unique "company stores," we believe that it is only in the context of this litigation that he would ever design to designate the Denney Block as something as pedestrian as a "shopping center." We noted that the term itself did not come easily from his lips

in describing his array of high-quality tenant-merchants, which he obviously believed were above what one would normally find in a "shopping center." Therefore, we are inclined to accept the types of store groupings identified by Blackman, and his conception of a "shopping center." The Denney Block is a "Main St." setting, which is the farthest of the four types of store groupings identied by Blackman from a "shopping center." Also relevant is Burrick's concession that the Debtor's fifteen (15) "Sparrs" stores are in "shopping centers," and that the Debtor's Freeport store was one of but three "Post Horn" stores, none of which are in "shopping centers."

As the term "shopping center" must be strictly construed and a landlord has the burden of proving that his stores comprise a "shopping center," we believe that our considerable doubt on this point must result in a determination that the Denney Block is not a "shopping center." Denney has not met his burden of proving that either the physical configuration of the stores in issue or the economics of their lease arrangements are indicative of a "shopping center." We therefore rule that the "shopping center" provisions of § 365(b)(3) are inapplicable here.

## F. RESTRICTIVE CLAUSES IN NON-SHOPPING CENTER LEASES ARE SUBJECT TO BANKRUPTCY-COURT MODIFICATION

The determination that the Denney Block is not a "shopping center" is highly significant. Congress has declared that, only with respect to shopping centers, are bankruptcy courts required to scrutinize the financial condition, percentage-rent impact, use clauses, and tenant-mix array of a proposed assignee of a Debtor-tenant's lease. *See* 11 U.S.C. §§ 365(b)(3)(A), (b)(3)(B), (b)(3)(C), and (b)(3)(D). *Cf. In re Tech Hifi, Inc.*, 49 B.R. 876, 879–80 & n. 2 (Bankr.D. Mass.1985) (pre–1984 version of § 365(b)(3), which did not include the specific restrictions that Congress included in the 1984 amendments, is interpreted as not containing such restrictions). The clear implication is that, in non-shopping center leases, some degree of modification of lease terms

is not forbidden in the application of § 365(b).

This conclusion is borne out by review of the controlling Third Circuits precedents. While it is true that executory contracts must, generally, be accepted in their entirety, *i.e., cum onere, In re Italian Cook Oil Corp.*, 190 F.2d 994, 997 (3d Cir.1951), this principle is qualified by a later decision holding that "the question of whether enforcement [of a lease covenant] in a particular case would be consistent with other provisions of the Bankruptcy Act" and "the inherent equity powers of a court of bankruptcy" permit a debtor to accept a lease without being subject to certain clauses therein. *In re Fleetwood Motel Corp.*, 335 F.2d 857, 862 (3d Cir.1964). Thus, "the great majority of decisions ... find that the bankruptcy court does have discretionary power to authorize some deviation [in lease terms] ... where there is no demonstrable economic detriment to the landlord." *In re Mr. Grocer, Inc.*, 77 B.R. 349, 354 (Bankr.D.N.H.1987). *Accord: In re Windmill Farms, Inc.*, 841 F.2d 1467, 1473 (9th Cir.1988); *Tech Hifi, supra*, 49 B.R. at 879–80; *In re Vista VI, Inc.*, 35 B.R. 564, 567 (Bankr.N.D.Ohio 1983); *In re U.L. Radio Crop.*, 19 B.R. 537, 543–45 (Bankr.S.D. N.Y.1972); and *In re Sapolin Paints, Inc.*, 5 B.R. 412, 421–23 (Bankr.E.D.N.Y.1980).

Further, we believe that the courts in *Mr. Grocer*, 77 B.R. at 354–55; and *Tech Hifi, supra*, 49 B.R. at 879–80, are correct when they emphasize that the enforcement of a particular lease provision is dependent on the landlord's proving that the provision substantially serves the economic benefit of the landlord and/or his other tenants. We note that we have recognized the potential unenforceability of contract terms when contrary policies of the Bankruptcy Code appear. Thus, in *In re University Medical Center*, 93 B.R. 412, 416–17 (Bankr.E.D.Pa.1988); *In re St. Mary Hospital*, 89 B.R. 503, 511–12 (Bankr.E.D.Pa. 1988); and *In re Sudler*, 71 B.R. 780, 787 (Bankr.E.D.Pa.1987), we held that the requirement that a debtor cure a default in order to assume an executory contract, pursuant to § 365(b)(1), must yield if its

enforcement effects a violation of 11 U.S.C. § 525(a) by requiring a debtor to pay a pre-petition debt as a condition for receipt of a governmental benefit. Thus, we have held that even the most basic of the assuming-tenant's responsibilities, curing the lease defaults, as set forth in § 365(b)(1), can be modified by a bankruptcy court.

We therefore conclude that restrictive clauses in leases are subject to modification by bankruptcy courts. We also conclude that such clauses are enforceable only where the landlord meets its burden of proving that the restrictive covenants in issue are material and are significant in protecting the economic interests of the landlord and of its other tenants.

### G. THE LANDLORD HAS FAILED TO MEET ITS BURDEN THAT THE LEASE COVENANTS IN ISSUE HERE ARE MATERIAL OR ECONOMICALLY SIGNIFICANT ECONOMICALLY

#### 1. THE "GENERAL USE" RESTRICTIONS

██ Both the "fire sale" and "black out" restrictions are restrictions on the use of the premises by the Debtor. We note, however, that many of the cases involve lease provisions concerning more generalized restrictions regarding the use of stores for sales of only certain types of merchandise. Such "general use" restrictions have frequently been found unenforceable, unless the change effected is a truly dramatic one which significantly impacts upon the landlord or its other tenants. *See Tech Hifi*, 49 B.R. at 377–78 (use restricted to sale of electronics goods held unenforceable to bar assignment to leather goods retailer); *Vista VI, supra*, 35 B.R. at 566 (use for only "Hickory Farms" cheese store held unenforceable to bar assignment to local, nationally unknown cheese retailer); *In re Evelyn Barnes, Inc.*, 32 B.R. 825, 827, 831 (Bankr.S.D.N.Y.1983) (use restricted to high grade women's clothing retailer held not to bar assignment to discount women's clothing retailer); and *U.L.*

*Radio, supra,* 19 B.R. at 543–45 (use for only sale of television and electrical appliances held unenforceable to prevent assignment for use as a restaurant). A general use clause was also the basis for the denial of an assignment in one of the three principal authorities cited in its support by Denney, *In re TSW Stores of Nanuel, Inc.*, 34 B.R. 299, 301 (Bankr.S.D.N.Y.1983) (use restricted to retail sale of toys held enforceable to prohibit assignment to a discount dealer in wide variety of items similar to that sold by another store in the same shopping center). We believe that *TSW* is distinguishable from the instant case because the difference in use there was proven to have a significant economic impact on one of the shopping center's other large tenants.

We note that the focus of most of Denney's testimony was upon his desire to restrict the Denney Block to "company stores." This attempt to establish a successful general use-clause issue was, however, totally unsuccessful for several reasons. First, the use clause in the Debtor's lease, see page 252 *supra*, includes no restriction in use to, and in fact makes no reference to, "company stores." It merely restricts the Debtor's use of its store to, basically, sale of men's and women's apparel and accessories. Secondly, at least two of the Denney Block tenants, Class and Xmas, are *not* "company stores." Thirdly, despite Denney's attempt to contend that he was misled about the Debtor's current lack of direct association with Hook, it is clear that the Debtor itself has not been, for some considerable time, a "company store," and it so advised Denney. Finally, EC appears to be almost interchangeable in its sales lines with the Debtor. It also sells mainly women's apparel and has, if anything, a closer association to a manufacturer than did the Debtor over the past few years. There is no evidence that "Oleg Cassini," which EC intends to prominently designate on its store sign, is less well known than Hook, or Jones or Bennetton, or Ashley.[2]

**2.** We admit our complete inability to take any sort of judicial notice in this area. To be frank, until the hearing, we never heard of Oleg, or Jones, or Ashley, or even Cole Haan, which

Therefore, despite the prominence that Denney gave to the general-use issue in his testimony, we fail to find any evidence that the lease provision concerning the general use of the store in issue was or would be violated by EC. Furthermore, considering the record as a whole, there is virtually no support for the conclusion that EC would fail to meet any of the criteria articulated by Denney as desiderata for stores in the Denney Block, even if they were all in fact in the lease.

## 2. THE "FIRE SALE" PROVISION

By way of contrast, Denney made no real attempt at any showing that the "fire sale" provision, although admittedly violated by the Debtor, had resulted in any economic detriment to it. We note that, in the only authority addressing the enforceability of a "fire sale" clause that we could locate, *In re Libson Shops, Inc.*, 24 B.R. 693 (Bankr. E.D.Mo.1982), the court refused to enforce such a clause.

Furthermore, once it got over the initial shock of the Debtor's demise, and learned of the true course of the proceedings in this court, Denney discontinued his efforts to litigate this issue in the Bankruptcy Court in Maine and never did present the issue to this court. It therefore could be argued that Denney waived any attempt to terminate the Debtor's lease on this basis. *See In re Holywell Corp.*, 75 B.R. 793, 795 (Bankr.S.D.Fla.1987) (landlord's continued agreement to defer rental payments waives denial of assumption of lease for non-payment under its terms); and *In re Bon Ton Restaurant & Pastry Shop, Inc.*, 53 B.R. 789, 802 (Bankr.N.D.Ill.1985) (landlord estopped from claiming breach of requirements that tenant must maintain certain physical aspects of premises by failing to raise same prior to the debtor's filing of its motion to assume the lease).

Finally, it is clear that whatever damage was done by EK's action of conducting a "going out of business" sale on the premises, it is already done. EC has every intention of opening its store as soon as possible and operating it more successfully than the

Debtor. Like *any* new tenant obtained by Denney, it will clearly start anew without advertising any "going out of business sale." There is no reason to suspect that EC will be going out of business at any time in the near future.

Therefore, the "fire sale" clause should in no sense be an impediment to EC's assumption of the Lease in issue.

## 3. THE "BLACK OUT" PROVISION

Much that was said about the impact of the "fire sale" provisions can be incorporated by reference in our analysis of the "black out" provision. The only known authorities addressing such provisions have refused to enforce them. *In re Connellsville Plaza v. Jiffy Foods Corp.*, 92 B.R. 136, 138 (W.D.Pa.1988) (vacancy in property is not a material lease violation as long as the rent is being paid); and *In re Food City, Inc.*, 95 B.R. 451 (Bankr.W.D.Tex. 1988) (lease clause stating that a "black out" entitled the landlord to a $250,000 penalty was not enforcable). Denney failed to prove any detriment to himself or his other tenants as a result of the Debtor's "black out." *Compare id.* at 3 (landlord in *Food City, supra,* established that its previous "bitter experience" with the debtor's predecessor had caused it to insert the clause; nevertheless, the clause was not enforced). Denney arguably waived this lease provision by not taking *any* action upon the store's "going dark." EC fully intends, as would any successor to the Debtor, to commence business as soon as possible, rendering any violation of this clause by the Debtor a moot and purely historical point.

We perceive no just basis for denying the Debtor's assignment of the Lease to EC on the basis of the "black out" clause.

## 4. THE "MINIMUM SALES" PROVISION

Perhaps the most novel issue raised by this motion is the enforceability of the "minimum sales" provision which, if enforced, would probably allow Denney to terminate the Lease in July, 1989. If this provision were enforced, with EC having to

Denney obviously believes, as the anchor of the

Denney Block, is *very* well known nationally.

incorporate the Debtor's sales record through February 20, 1989, the value of the Lease would obviously be nominal. EC's offer to pay $77,000 for the right to obtain an assignment of the Lessee was expressly predicated on its receiving the right to utilize the Debtor's former Freeport store for at least the remaining four years of the lease. It is certainly questionable whether, in the short time before EC could open the store and July, 1989, it could attain a sales volume, when combined with the Debtor's interrupted sales record, sufficient to meet that required as the minimum in the first six lease-years of the Debtor's lease.

There is no authority considering any similar lease provision. Denney's principal authorities, other than *TSW Stores, supra,* are *In re LHD Realty Corp.,* 20 B.R. 717, 718–20 (Bankr.S.D.Ind.1982) (debtor-tenant denied motion to modify or set aside a lease as a whole; particularly onerous terms were not designated); and *In re Pin Oaks Apartments,* 7 B.R. 364, 368–73 (Bankr.S. D.Tex.1980) (debtor-tenant was not entitled to sub-lease a property pursuant to terms which changed the rental computations under the main lease). The Trustee cites to *In re Howe,* 78 B.R. 226, 228–31 (Bankr.D. S.D.1987) (requirement of payment of an "assumption fee" measured by four (4%) percent of the remaining outstanding rent balance payable upon an assignment of a lease held unenforceable); and *Mr. Grocer, supra,* 77 B.R. at 351–55 (the landlord's right of first refusal of any assignee of the lease was held unenforceable). The cases cited by the Trustee rely heavily upon 11 U.S.C. § 365(f), which renders unenforceable any lease provision "that prohibits, restricts, or conditions" the assignment of the lease. This is a corollary to the well-established principle that forfeitures of realty leases are not favored. *See In re C & C TV & Appliance, Inc.,* 97 B.R. 782, 786 (Bankr.E.D.Pa.1989). *See also In re Madison's Partner Group, Inc.,* 67 B.R. 633 (Bankr.D.Minn.1986) ("cross-default" clause in lease of business with that of another lease for equipment with an entity related to the landlord held unenforceable).

Any restrictive clause restricts and conditions the assignment of leases to some degree. However, clearly not all such covenants are unenforceable. As stated above, we believe that, in order to enforce a restrictive clause, a non-shopping center lessee must establish that the clause is material and that it or its other lessees will suffer substantial economic detriment as a result of the failure of the bankruptcy court to enforce the clause in issue.

Several of the same considerations which we recited in considering the "fire sale" and "black out" clauses in the Lease are relevant here. Denney utterly failed to establish any economic detriment whatsoever that he or the other tenants would incur directly if this provision were not enforced. The particular clause does not appear to us to be inserted mostly for the protection of the landlord, but rather for the protection of the tenant, who thus may obtain an escape hatch from an unprofitable location. Furthermore, it appears that such a clause was waived in reference to Jones and, in all probability, would have been waived in the case of the Debtor. There is no evidence that such a clause has ever been utilized or even threatened to be utilized by Denney as a means of his involuntarily terminating a tenant's lease. This being so, we decline to find this lease provision sufficiently material or of sufficient economic import to Denney or any of his other tenants to allow Denney to use it as a vehicle to prevent the Debtor from assigning the Lease to EC. We find this provision to be equally as violative of § 365(f)(1) as the provisions considered in *Howe, Mr. Grocer,* and *Madison's Partner Group.* We therefore refuse to allow Denney to invoke this clause to terminate EC's prospective tenancy.

Thus, we conclude that none of the restrictive clauses in the Lease preclude the Debtor's assuming it and assigning it to EC.

H. THERE IS NO OTHER BASIS FOR DENYING THE DEBTOR'S PROPOSED ASSIGNMENT OF ITS LEASE IN THE DENNEY BLOCK TO EC.

Except for matters directly related to § 365(b)(3), which we deem inapplicable be-

cause we find that the Denney Block is not a "shopping center," Denney has articulated no other impediment to assignment of the Lease to EC, and we can detect none. We understand that the Debtor itself will pay the pre-assignment rent delinquency in full. It appears to us that EC is clearly financially capable of making future rental payments. Therefore we deem Denney's leasehold interest adequately protected by the proposed assignment. *Compare, e.g., C & C, supra,* 97 B.R. at 788–89 (landlord adequately protected by proposed sale of lease and purchase option to highly-liquid entity); *In re Gold Standard at Penn, Inc.,* 75 B.R. 669, 671–72 (Bankr.E.D.Pa. 1987) (debtor permitted to liquidate rent delinquency of almost a year over a period in excess of five years); *In re Great Northwest Recreation Center, Inc.,* 74 B.R. 846, 853–57 (Bankr.D.Mont.1987) (lease provision requiring debtor-tenant to have working capital and lines of credit hold not enforceable to bar lease assumption); and *In re Alipat, Inc.,* 36 B.R. 274, 277–79 (Bankr.E.D.Mo.1984) (prospective assignee not required to produce letters of credit or other "absolute guarantees" of payment to "adequately protect" the landlord).

## I. CONCLUSION

For the reasons stated, we intend to grant the Trustee's motion as long as a reasonable economic accommodation to Denney to cure past defaults and make rental payments in the future is assured. However, we are unsure precisely how to frame the ultimate order granting the Trustee's motion, due to lack of any evidence as to exactly what sum the Debtor will pay and what sums EC will pay to Denney as conditions for assumption of the lease. We shall therefore enter an Order directing the Trustee to prepare and circulate an appropriate form of Order consistent with this Opinion, and we will execute the resultant order as the final resolution of this controversy.