**In re JOSHUA SLOCUM, LTD., a Delaware Corporation, Debtor.**

**In re JOSHUA SLOCUM, LTD., a Pennsylvania Corporation, Debtor.**

**Bankruptcy Nos. 88–14082S, 88–14083S.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 27, 1989.

J. Scott Victor, Lashner, Victor & Maschmeyer, Philadelphia, Pa., trustee.

James J. O'Connell, Asst. U.S. trustee, Philadelphia, Pa.

Robert Burrick, Warshaw, Burstein, Cohen Schlesinger & Kuh, New York City, for debtor.

James W. Adelman, Morris & Adelman, Philadelphia, Pa., for Creditors' Committee.

David I. Grunfeld, Rosenwald, Pollack & Grunfeld, Philadelphia, Pa.

## OPINION

DAVID A. SCHOLL, Bankruptcy Judge.

This is our second Opinion addressing objections to the proceedings in which the Trustee in these closely-related Chapter 11 cases, MELVIN LASHNER, ESQUIRE, seeks to have this court confirm simultaneous assumptions and assignments of many of the Debtors' store leases to the respective high bidders for these leases at a hearing on March 8, 1989. In our prior Opinion of March 29, 1989 (hereinafter referred to as *"Opinion I"*), 99 B.R. 250, we permitted the assignment of one of the store leases to a retailer over certain objections by the landlord who owned that facility. In this Opinion, we address a Motion by which three other Landlords, who outbid all retailers present and bought back their respective leases, seek to "stay" our entry of an Order allowing assumption and assignment of their leases on the ground that we improperly allowed the bidding to go forward without first qualifying prospective retailer-bidders as potentially successful assignees of their respective leases. Because we find such a qualification process is not required by the Bankruptcy Code and is likely to disserve the desideratum of encouraging optimal bidding in such proceedings, we shall deny the Landlords' motion.

Much of the procedural history surrounding the instant motion has already been recited in *Opinion I*, at 251–252, and will not be repeated here. The bidding on the leases in question held by the Debtor at (1) Cherry Hill Mall, Cherry Hill, New Jersey; (2) Columbia Mall, Columbia, Maryland; and (3) The Shops at National Place, Washington, D.C., took a different course than the bidding for the Debtors' lease in the "Denney Block," Freeport, Maine, that was in issue in *Opinion I*. In the matters in question here, although retailers engaged in bidding for the stores, the respective Landlords prevailed in the bidding process. The respective successful bidders and their bids for the stores noted above were (1) CHERRY HILL CENTER, INC., $36,000; COLUMBIA MALL, INC. $70,000; and THE ROUSE COMPANY OF THE DISTRICT OF COLUMBIA, $48,000. (These three successful bidders are collectively referred to herein as "the Landlords").

The instant motion was spawned by the final portion of the "lengthy discussion" preceding the bidding of March 8, 1989, on the Trustee's motion to assume or assign seventeen (17) of the Debtor's store leases. *See Opinion I*, at 252. At that hearing, several of the landlords of the stores, including the Landlords in issue, vehemently objected to any procedure which allowed bidding to occur before a hearing at which qualifications of the potential bidders

present could be established.[1] On the other hand, retailers present to bid for the locations insisted with equal vehemence that they were eminently qualified to be replacement tenants for the Debtor and that, having appeared for that express purpose, they were anxious to conduct the bidding immediately. The Trustee, while never agreeing to the concept of a pre-bidding qualification hearing, initially expressed a desire to attempt to avoid appeals by landlords from the process by giving each of them a right of first refusal by matching the highest retailers' bid at the close of the bidding on each lease. However, upon threats of the retailers to walk out of a process in which they would merely serve as "stalking horses" for the landlords, and upon objections by both the Debtor and the Creditors' Committee that this process would chill the bidding, the Trustee ultimately agreed to a process of completely open bidding, in which the landlords received no right of first refusal and were obliged to outbid any retailers interested in bidding for the lease in that location if they wished to prevent an assignment to a successful bidder-retailer.

---

1. This position was not unanimous among the landlords. Counsel for the Denney Block argued, to the contrary, that time was needed by landlords to prepare for qualification hearings and that his client desired to have the bidding go forward immediately, but to allow his client to have an extended period after the bidding to investigate the circumstances of any successful bidder before the scheduling of a qualification hearing. The hearing on the Denney Block lease-assumption was, consistent with that landlord's wishes, ultimately continued until March 22, 1989.

2. The difficulties in the Denney situation, as Opinion I makes clear, a difference in interpretation regarding several lease clauses, most notably arose principally because of a "minimum purchase" clause in that lease, moreso than from an objection to the acceptability of the particular successful bidder.

3. At the hearing in which the "shopping centers" issue was successfully contested by the Trustee as to the Denney Block, see Opinion I, at 256–257, even the Trustee's witnesses conceded that the store locations in issue here were in "shopping centers." See id., supra, at 253, 256.

4. 11 U.S.C. § 365(b)(3) provides as follows:

This decision led to a heated and therefore successful bidding process. While the Landlords in issue ultimately outbid all retailers for each of their locations, this was only after extensive bidding by retailers for the Columbia and Washington locations. Other landlords, such as Denney, approached the matter less defensively. Except for the Denney situation and one other location where the successful bidder in the Denney matter,[2] European Collections, Inc., decided not to proceed to take the lease and joined with the landlord to make a monetary settlement which made the Trustee for its bid, see Opinion I, at 252, the retailers who were successful bidders have apparently all made themselves acceptable to their respective landlords. Therefore, practically, it does not appear that any patently unqualified bidders participated in the process.

The principal argument of the Landlords, which they expressly reserved prior to engaging in the bidding process on March 8, 1989, is that their undisputed status as "shopping center" landlords[3] entitled them to particular scrutiny of the ability of any bidder to meet the heightened criteria of 11 U.S.C. § 365(b)(3)[4] be-

---

(3) For the purposes of paragraph (1) of this subsection and paragraph (2)(B) of subsection (f), adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

(A) of the source of rent and other consideration due under such lease, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease;

(B) that any percentage rent due under such lease will not decline substantially;

(C) that assumption or assignment of such lease is subject to all the provisions thereof, including (but not limited to) provisions such as radius, location, use, or exclusivity provision, and will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; and

(D) that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center.

fore any bidding took place.[5]

■ Unable to cite any authority in support of their position, the Landlords were compelled to label their motion as raising "a matter of first impression." They attempted to analogize this process to that of federal government procurement procedures, in which an offeror must generally qualify before its bid is even accepted. *See* 41 U.S.C. § 253c.

The government procurement analogy does not appear particularly apt. The process in issue there involves but two parties, one of which (the government) has unilaterally chosen to protect itself, as is its right because no other interests are adversely affected thereby. By way of contrast, the bankruptcy process in issue here involved landlords, retailer-bidders, *and* the interests of the Debtors and their creditors. The latter two categories include perhaps the most important players in any bankruptcy case and have only the interest of maximizing the estate's assets at heart. The government conducts its own internal qualification process, proceeding at its own pace according to its own needs. The qualification envisioned by the Landlords here would have been adversarial and would have mandated the use of the scarce resource of court facilities to ultimately decide any disputes. If a large number of bidders appeared, as they did in this instance, the facilities of the court would be taxed with deciding a score of "qualification" matters, all in the name of a hypothetical controversy that could develop into a matter of actual significance if and only if a particular bidder were successful. Time was a factor here, as often is the case in a bankruptcy process, because the liquidation of the Debtor was, at some locations, rapidly winding down and the Debtor was committed to paying the rents through the date of the March 8, 1989, hearing. It is doubtful that we could have completed qualification hearings and rattled off decisions after such hearings in less than several weeks. Allowing the qualification process to take place only if needed after the bidding process, as we did, allowed the bidding to take place immediately and the controversies to be pared down to that over the Denney Block lease.

Also relevant is the direct toll and indirect psychological toll that a process such as that requested by the Landlords would take upon the bidding process. The courts have frowned upon procedures which have a chilling effect upon a bidding process. *See, e.g., In re Stanley Engineering Corp.*, 164 F.2d 316, 319 (3d Cir.1947), *cert. denied sub nom Root v. Galman*, 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 417 (1948); and *In re Peoples Cab Co.*, 89 F.Supp. 577, 580 (W.D.Pa.1950). The qualification hearings envisioned by the Landlords would require potential bidders to hire counsel and prepare for a hearing before it was even established that these bidders were successful and hence that such time and costs were necessary. We therefore conclude that requiring such a pre-bidding qualification hearing would put a damper upon free and open participation by all retailers ready and willing to engage in the bidding-process.

The Landlords' suggestion that such a qualification process might be welcomes by bidders, who could then participate in bidding free of lingering doubts of their abili-

---

5. At oral argument on this motion on April 19, 1989, the Landlords' counsel also disputed, at least mildly, the sufficiency of the notice of the hearing. The written notice of the hearing, dated February 24, 1989, set forth the high bids as to the leases of seventeen (17) of the Debtors' locations; required that objections be filed in writing by March 7, 1989, and heard on March 8, 1989; and, in its last paragraph, stated that "[a]ll prospective bidders are invited to attend the hearing and bid on all leases." The Landlords contended that the notice failed to meet the prerequisite of Bankruptcy Rule (hereinafter "B.Rule") 6004. The Trustee argued convincingly that, since the motion was in actuality a request to assume the leases in issue pursuant to 11 U.S.C. § 365(b)(1), the applicable B.Rule was 6006, not 6004. Although we subsequently refer to several authorities addressing sales of assets pursuant to B.Rule 6004 because such proceedings, like the process in issue here, present a bidding process, we agree that the pertinent rule is B. Rule 6006. Except for the purported deficiency in not requiring the qualification process to precede the hearing, the Landlords were unable to articulate any particular deficiency in the notice process.

ty to qualify as replacement tenants, is belied by the observation that all of the bidding retailers were adamant in their opposition to the Landlords' proposal in this regard. Clearly, it was in the interests of the Landlords to encumber the bidding process and eliminate competition, thus allowing the Debtor's leases to become available to be bought out by them at the lowest possible prices. We observe that the Landlords' self-interest in the bidding process was motivation for them to in fact chill the bidding. Serving such an interest is antithetical to the bidding process at issue.

We recognize that the Landlords had and have considerable rights under 11 U.S.C. § 365(b)(3) to contest the qualifications of the proposed assignees of the Debtor's leases. However, these potential rights heightened the risks for the bidders, as well as the landlords. If the bidding retailers were willing to take the risks of their time and resources by appearing and participating in the bidding process, we believe that there was no cause to add to their already-considerable disincentives to appear and bid. Ultimately, the Landlords could protect themselves in the qualification process.

The Landlords paint a potential scenario of the presence of insincere, unqualifiable bidders whose bids could artificially inflate the final bids. The presence of insincere bidders is rarely articulated as a problem at bankruptcy sales. The more typical deficiency claimed is that bids are chilled by the process as it exists and that therefore more lucrative potential bids are lost. *See, e.g., Stanley Engineering, supra*, 164 F.2d at 317–18; *Jacobsohn v. Larkey*, 245 F. 538, 540–41 (3d Cir.1917); *In re Superior Mushroom Growers Corp.*, 228 F.Supp. 372, 373 (E.D.Pa.1964); *In re Karpe*, 84 B.R. 926, 947–28 (Bankr.M.D.Pa.1988); and *In re Snyder*, 74 B.R. 872, 874 (Bankr.E.D. Pa.1987), *leave to appeal denied*, C.A. No. 85–4746 (E.D.Pa. August 5, 1987). Certainly, there is no evidence that any bid offered throughout the entire course of the proceedings on March 8, 1989, was presented

in other than utmost good faith by qualifiable assignees of the Debtors' leases. The acceptability of the successful bidders to the landlords generally has been established by the lack of contests in all but the Denney Block situation, which is not attributable to the bidder's lack of qualifications. *See* page 263 n. 1 *supra*. Any element of fraud which is introduced into the bidding process, including the presence of an unqualified bidder, is subject to court attention and corrective measures. Particularized "fraud" or "unfairness" in the bidding process is a ground for unravelling even an already-confirmed bankruptcy sale, let alone preventing confirmation of a sale from transpiring. *See, e.g., In re Chung King, Inc.*, 753 F.2d 547, 549–50 (7th Cir. 1985); *In re Time Sales Finance Corp.*, 445 F.2d 385, 386–87 (3d Cir.1971); and *Stanley Engineering, supra*, 164 F.2d at 318–20.

■ The precedents addressing issues which we believe are analogous to what is before us in the instant motion are those cases which have been established the standards which bankruptcy courts should consider in deciding whether to confirm duly-noticed and duly-conducted sales.[6] Judicial sales should be confirmed as long as the successful bid price is not grossly inadequate and the sale process was not tainted by fraud, unfairness, or mistake. *See Ballentyne v. Smith*, 205 U.S. 285, 290, 27 S.Ct. 527, 528, 51 L.Ed. 803 (1907); *Stanley Engineering, supra*, 164 F.2d at 318; *Superior Mushroom, supra*, 228 F.Supp. at 373; and *Karpe, supra*, 84 B.R. at 932. Generally, any bid proposed prior to a confirmation hearing is subject to withstanding a process whereby more attractive bids are solicited and will be entertained by the court. *See In re Susquehanna Chemical Corp.*, 92 F.Supp. 917, 919 (W.D.Pa.1950); and *In re Blue Coal Corp.*, 59 B.R. 157, 162 (Bankr.M.D.Pa.1986). However, once the process of solicitation of more attractive bids has been completed, the sale to the best bid resulting from this process

---

6. We recognize that what was before us was not a sale, but a motion to assume and assign leases. *See* page 264 n. 5 *supra*. However, the process is certainly sufficiently like that of a sale to justify application of principles established in cases involving bankruptcy sales.

should ordinarily be final. *See Jacobsohn, supra,* 245 F. at 541; and *Peoples Cab, supra,* 89 F.Supp. at 580. Similarly, the assignments of the leases in issue to the Landlords should be confirmed as final unless we are convinced that flaws developed in the bidding process.

These principles are well-established. The assertion by the Landlords that their motions present an issue of first impression is, in our view, merely a concession that the Landlords would wishfully like this court to provide them with rights and protections not provided by the Bankruptcy Code and that no court has ever so much as considered holding that the Code implicitly provides or should provide. While we are sensitive to the due process rights, *see In re Fernwood Markets,* 73 B.R. 616, 619–21 (Bankr.E.D.Pa.1987) and other procedural rights, *see Snyder, supra,* 74 B.R. at 874–77, of parties interested in the sale process, we are unwilling to elevate the Landlords' rights under § 365(b)(3) to the extent of requiring a pre-bidding qualification process in the process of the assumption of shopping-center leases. Requiring such a process would invade the rights of the purchasers, the Debtors, and the creditors in the assignment and assumption process. We believe that § 365(b)(3), on its face, provides shopping-center landlords with all of the protections that they are due under the Code.

Accordingly, we will deny the Landlords' motion. We are prepared to enter the proposed Orders submitted to us by the Trustee authorizing him to assume the three leases in issue and then assign them to the respective Landlords with only slight revisions.[7]

---

**7.** We accept the Landlords' critique of the Trustee's draft orders that the payment of the sums due to the respective Landlords for back rent should be simply simultaneously set off against the Landlords' respective bids, rather than being the subject of separate directives, as in the draft orders. We acknowledge, but reject, the Landlords' request that we hold off signing these Orders until all appeals have been resolved. There are, of course, no appeals from these Orders as of the date and time of their entry and we would not be so presumptuous as to anticipate that any appeals will be forthcoming. It is usually important to finally resolve as many issues as possible as soon as possible in any bankruptcy proceeding, and the instant issue is clearly no exception.