No. 95-4211

In re:  Food Barn Stores, Inc.   *
                                 *
          Debtor.                *
                                 *
                                 *
------------------------      *
                                 *
                                 * Appeal from the United States
Four B. Corporation,          * District Court for the Western
                                 * District of Missouri.
          Creditor - Appellant,  *
                                 *
     v.                          *
                                 *
Food Barn Stores, Inc.,          *
                                 *
          Debtor - Appellee.     *


          Submitted:  September 12, 1996

          Filed:  February 20, 1997


Before RICHARD S. ARNOLD, Chief Judge, FLOYD R. GIBSON, and ROSS,
     Circuit Judges.


FLOYD R. GIBSON, Circuit Judge.


     In this appeal, Four B. Corporation ("Four B") challenges the
district court's[1] affirmance of a bankruptcy court[2] order requiring Four B
to pay $2.1 million to secure assignment of a debtor's real property lease.
Utilizing a number of legal theories, Four B submits that the bankruptcy
court should have permitted it to

---

     The HONORABLE D. BROOK BARTLETT, Chief United States
District Judge for the Western District of Missouri.

     The HONORABLE FRANK W. KOGER, Chief United States Bankruptcy
Judge for the Western District of Missouri.

tender only $1.5 million for the contract. After careful contemplation of Four B's contentions, we affirm.

## I.  BACKGROUND

Food Barn Stores, Inc. ("Food Barn"), the debtor, owned and managed supermarkets in Missouri and Kansas. On January 5, 1993, Food Barn filed a voluntary petition for bankruptcy reorganization under Title Eleven of the United States Bankruptcy Code. For several months thereafter, the company continued to operate its business as a debtor-in-possession pursuant to 11 U.S.C. §§ 1107-1108 (1994).[3] On April 8, 1993, Food Barn entered into a Purchase Agreement with Four B; the agreement, which by its terms was subject to bankruptcy court approval, provided that Four B would tender $1.5 million to purchase the lease and certain equipment, fixtures, and inventory for the Food Barn store at a shopping center in Olathe, Kansas.[4] The Purchase Agreement also contained two "bid protection" features. Specifically, the contract granted Four B the right to match any rival offers for the property, and it precluded Food Barn from recommending an alternate party's proposal unless the competing bidder agreed to reimburse Four B no less than $10,000 for its "actual" legal and accounting expenses.

In order to effectuate the contract, Food Barn filed with the bankruptcy court a motion seeking authorization for the transaction. At a subsequent hearing on that request, Food Barn informed the judge that Schnuck Markets, Inc. ("Schnuck"), the proprietor of yet another chain of grocery stores, had offered $1.6 million for the lease. Nonetheless, because Food Barn desired

_____

Four B's attempt to restructure its finances was, in the end, unsuccessful, and the company thus found it necessary to liquidate its assets.

The lessor for this property was the Equitable Life Assurance Society of the United States ("Equitable").

2

immediate consummation of the deal, it expressed a willingness to honor the original Purchase Agreement with Four B.  Various interested parties then made arguments for or against assignment of the lease to Schnuck rather than Four B.[5]  For instance, citing 11 U.S.C. § 365(b)(3)(D) (1994), which essentially prohibits a bankruptcy court from approving a lease assignment that will "disrupt any tenant mix or balance in [a] shopping center," and professing its understanding that Schnuck did not intend to operate a supermarket on the property, Equitable exhorted the court to deny Schnuck's attempt to obtain the lease.  The representative of the Unsecured Creditors Committee, on the other hand, emphasized the importance of maximizing the estate's assets and implored the court to approve Schnuck's more lucrative bid.  After some deliberation, the court orally declared its preliminary inclination to authorize the original deal between Food Barn and Four B. Within seconds, though, Schnuck announced that it was raising its offer to $2.1 million.  The bankruptcy judge at that time granted Food Barn's request for a recess, stating, "Yeah, I think we all better have a recess for a half a million dollars."

When the hearing reconvened, Food Barn proposed that the court compel Schnuck to extend its best and final offer, which Four B would then be allowed to equal.  Four B, relying in part upon the tenant mix protections in § 365(b)(3)(D), remonstrated that it was inappropriate for the court to consider any of Schnuck's submissions, but the bankruptcy judge accepted Food Barn's first suggestion to oblige Schnuck to submit its best and final bid.  Schnuck verified that $2.1 million was its final offer, and Four B then volunteered to proceed under one of the two following courses

---

We are aware of the legal distinction between assignment of rights and delegation of duties.  When both rights and duties are transferred, it is permissible to characterize the transaction as an "assignment" of the lease or contract.  See Metropolitan Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.), 6 F.3d 492, 495 n.4 (7th Cir. 1993).

of action:  (1) it would match the offer with a right to appeal the bankruptcy court's insistence that Four B pay any amount in excess of the original $1.5 million purchase price; or (2) it would match without reservation Schnuck's initial bid of $1.6 million.  The judge selected the first option, and he subsequently approved the sale to Four B for $2.1 million.  In accord with the court's order, Four B placed $600,000 of the purchase price into an escrow account pending resolution of this appeal.

The district court affirmed the bankruptcy court's ratification of the sale for $2.1 million, and the matter is now before us for disposition. For reversal, Four B contends the bankruptcy judge committed error by (1) considering Schnuck's proposals despite the fact that the tenant mix provisions of § 365(b)(3)(D) would have prevented assignment of the lease to that company, (2) allowing additional bids after the court had orally accepted Four B's original $1.5 million offer, and (3) refusing to honor Four B's right to match Schnuck's initial $1.6 million submission.  We consider each of these arguments seriatim.

## II.  DISCUSSION

### A.  Standard of Review

As a second court of review in bankruptcy proceedings, we apply the same standards used by the district court.  See Jones Truck Lines, Inc. v. Foster's Truck & Equip. Sales, Inc. (In re Jones Truck Lines, Inc.), 63 F.3d 685, 686 (8th Cir. 1995).  We examine the bankruptcy court's findings of fact for clear error and its conclusions of law de novo.  Id. Furthermore, we will reverse on matters committed to the bankruptcy court's discretion only if the court abused its discretion.  See id.

4

**B. Schnuck's Ineligibility under § 365(b)(3)(D)**

Section 365 of the Code allows the trustee,[6] within a prescribed time period and subject to statutory limitations as well as bankruptcy court approval, to assume "any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a); see also Cameron v. Pfaff Plumbing & Heating, Inc., 966 F.2d 414, 415 (8th Cir. 1992). In addition, the statute authorizes the trustee to assign most types of contracts the trustee has elected to assume. See 11 U.S.C. § 365(f). Before the court will sanction an assignment, however, the trustee must provide "adequate assurance" that the assignee will satisfactorily perform under the contract. See id. § 365(f)(2)(B).

In general, the Code is conspicuously silent on what suffices as "adequate assurance of future performance." Nonetheless, as applied to one discrete class of unexpired leases, Congress has supplied quite explicit guidelines for determining when the trustee has met this standard. See id. § 365(b)(3). Namely, when the trustee seeks to assume or assign a lease of real property in a shopping center, the trustee must furnish, inter alia, adequate assurance "that assumption or assignment of such lease will not disrupt any tenant mix or balance in such shopping center." Id. § 365(b)(3)(D). This legislative directive to protect the tenant mix in shopping centers forms the basis for one of Four B's grounds for reversal.

Four B emphasizes there is a strong inference that Schnuck, which owns a grocery store across the street from the site at issue, did not intend to open another supermarket in the location vacated by Food Barn. At the hearing in bankruptcy court, Schnuck

---

Food Barn, as debtor-in-possession, enjoyed all the powers under § 365 as a duly appointed trustee. See 11 U.S.C. § 1107(a) (1994). For ease of discussion, this opinion refers to Food Barn as a trustee.

was evasive about its designs with regard to the property, but it conceded that it would be disinclined to operate the premises as a grocery store. See Transcript of Hr'g at 142 ("Our interest in consolidating volume would be to acquire the property and sublease or lease the space to another retail use, a non-food retail use."). Echoing the protestations originally advanced by Equitable, Four B contends that Schnuck was not qualified to bid on the lease because its acquisition of the property would have necessarily disrupted the tenant mix in the Olathe shopping center. According to Four B, it naturally follows that the bankruptcy court committed error when it considered any of Schnuck's offers.[7]

We disagree. To begin with, we reject any intimation that a bankruptcy court should prequalify bidders before conducting a sale of the estate's property. Adoption of this custom would, in our view, needlessly divert the court's time and resources to matters that are true issues only in the most speculative sense. See In re Joshua Slocum, Ltd., 99 B.R. 261, 264 (Bankr. E.D. Pa. 1989).[8]

---

In light of the fashion in which we analyze this issue, we need not decide whether § 365(b)(3)(D) is germane to leases, such as the one before us, that do not include language restricting use or purporting to preserve tenant mix. See generally In re Ames Dep't Stores, Inc., 127 B.R. 744, 753 (Bankr. S.D.N.Y. 1991)("Where there is no indication of any intention by Congress to do anything other than hold a shopping center debtor tenant to its bargain with a landlord and to leave intact the property interests of debtor and landlord as set forth in that bargain, the courts should not imply an additional non-bargained-for term."); In re Ames Dep't Stores, Inc., 121 B.R. 160, 165 (Bankr. S.D.N.Y. 1990)("[S]ection 365 (b)(3)(D) must be interpreted to refer to contractual protections and not undefined notions of tenant mix.").

In In re Joshua Slocum, Ltd., 922 F.2d 1081 (3d Cir. 1990), the Court of Appeals for the Third Circuit vacated the bankruptcy court's opinion in In re Joshua Slocum, Ltd., 99 B.R. 250 (Bankr. E.D. Pa. 1989). The circuit court's opinion, however, has absolutely no impact upon In re Joshua Slocum, Ltd., 99 B.R. 261 (Bankr. E.D. Pa. 1989), which is the case we cite as authority. See In re Carlton Restaurant, Inc., 151 B.R. 353, 357 (Bankr. E.D. Pa. 1993)(noting the subsequent history of the decision we find relevant).

Moreover, we are persuaded that a prequalification requirement would have an adverse effect on the bidding process. Because a premature adjudicative evaluation of an individual bidder's eligibility would almost certainly require that person to hire an attorney and prepare for a hearing without any assurance that his will be the triumphant offer, it seems obvious that prequalification would deter some individuals who might otherwise be likely to participate in the bidding.[9] <u>See</u> <u>id.</u> ("[R]equiring . . . a pre-bidding qualification hearing would put a damper upon free and open participation by all retailers ready and willing to engage in the bidding-process."). Indeed, even in the relatively distinct context of § 365, we have located numerous cases in which courts solicited competing offers before assessing the eventual assignee's ability to satisfactorily perform under the relevant lease. <u>See</u> <u>In re Casual Male Corp.</u>, 120 B.R. 256, 259 (Bankr. D. Mass. 1990)(describing practice through which the court accepted offers before determining the prevailing party's qualifications); <u>In re Windmill Farms Management Co.</u>, 116 B.R. 755, 757 (Bankr. S.D. Cal. 1990)(same); <u>Joshua Slocum</u>, 99 B.R. at 264-66. As such, it cannot be gainfully argued that the bankruptcy court abused its discretion when it failed to precertify Schnuck as an acceptable assignee.

In apparent recognition of the weight of authority against this position, Four B explains that it did not expect the bankruptcy court to precertify Schnuck. Instead, seizing upon the <u>Joshua Slocum</u> court's observation that none of the bidders in that case was "patently unqualified" or "insincere," <u>Joshua Slocum</u>, 99 B.R. at 263, 265, Four B maintains that Schnuck, which it describes as manifestly unacceptable under § 365(b)(3)(D), was clearly

It is notable that Four B, like the party favoring prequalification in <u>Joshua Slocum</u>, had an identifiable interest in keeping the sale price as low as possible.

7

ineligible to bid even in the absence of a prequalification process.  To buttress this point, Four B adverts that, at the time the judge initially issued an oral "ruling" in its favor, its bid was $100,000 lower than Schnuck's proposal.  Four B continues that the only rationale supporting acceptance of the lower offer was Schnuck's inability to satisfy the command of § 365.  Consequently, because Schnuck was patently unqualified when it extended the first offer, the company must also have been patently unqualified when it raised the bid to $2.1 million.

Unlike Four B, we do not think that Schnuck was patently unqualified when it engaged in the bidding.  Though it is true that the court at first expressed a predilection toward Four B's $1.5 million offer, we can by no means agree that the court made this decision based on § 365(b)(3)(D).  In fact, when the court stated its preliminary intentions, it had not yet received any evidence pertinent to the tenant mix issue.  We simply cannot accept that the experienced bankruptcy judge made a definitive determination on a hotly disputed factual question solely in reliance on the somewhat vague representations of counsel.[10]  The judge's comments do reveal that he was pondering the application of § 365 to the facts before him, but our review of the record discloses that his preference for Four B's bid was counseled more by perceived time constraints than by any final resolution of the tenant mix arguments.[11]  The court never ruled, or even hinted, that it

_____

We do not mean to imply that the court must receive evidence any time a conflict about tenant mix arises.  We merely observe that where, as here, the parties' attorneys are unable to agree on a possible assignee's intentions and the effect upon tenant mix caused by an alleged change in use, it would be highly irregular to render a dispositive decision before, at minimum, hearing some testimony on the issue.

After the court announced its partiality toward the Four B proposal, Schnuck advised the court that it was prepared to raise its offer.  The court replied, "Well, you know, it -- that's probably a possibility, but I think, in this instance, if I had time and the debtor had time, but the debtor has told me they haven't got time."  Transcript of Hr'g at 64-65 (emphasis added).  This immediate response bolsters our understanding that the need for an instantaneous deal, and not a belief that Schnuck was an absolutely ineligible assignee, caused the court to view Four B's bid more favorably.  To be sure, had the court deemed Schnuck to be patently unqualified, it would not have acknowledged the "possibility" that the company might increase its offer.

8

considered Schnuck to be patently unqualified,[12] and we decline to retroactively hold that the company occupied that status.

Likewise, we could not rightfully characterize Schnuck as an insincere bidder. Schnuck may have possessed suspect motivations for participating in the auction and seeking to procure the lease, but it appears undisputed that the company is a financially sound party which truly desired the assignment and would have been ready, willing, and able to remit the purchase price should it have won the coveted prize. Thus, despite our admitted misgivings about Schnuck's conduct, we cannot hold that it acted insincerely.

There was no need for the bankruptcy court to precertify Schnuck, and the company was not a patently unqualified or insincere bidder. Under these circumstances, the district court did not abuse its discretion by entertaining Schnuck's overtures.

### C. The Propriety of Receiving Schnuck's $2.1 Million Offer

Proclaiming the undoubted importance of finality and integrity in judicial sales, Four B complains that it was improper for the bankruptcy court to accept additional offers after it had verbally approved the Purchase Agreement negotiated by Four B and Food Barn. Four B attaches much significance to In re Gil-Bern Indus., 526

---

After approving the $2.1 million sale to Four B, the court, in an attempt to "protect th[e] record," allowed the parties to introduce evidence on the tenant mix question. The results of this post-hoc procedure have no bearing on the question of whether Schnuck was patently unqualified at the time it submitted bids.

9

F.2d 627 (1st Cir. 1975), in which the Court of Appeals for the First Circuit declared that "[i]f there is no local custom to the contrary, . . . it is an abuse of discretion for a bankruptcy court to refuse to confirm an adequate bid received in a properly and fairly conducted sale merely because a slightly higher offer has been received after the bidding is closed."  Id. at 629.

By way of this relatively benign statement, the First Circuit aligned itself with the scores of courts which have adopted the modern rule outlining the limited circumstances under which an approved judicial sale may be undone.  Typically, a court will reopen bidding, and thereby upset the results of a properly conducted judicial auction, only if "there was fraud, unfairness or mistake in the conduct of the sale . . . or . . . the price brought at the sale was so grossly inadequate as to shock the conscience of the court."  In re Stanley Eng'g Corp., 164 F.2d 316, 318 (3d Cir. 1947), cert. denied, 332 U.S. 847 (1948); accord In re WPRV-TV, Inc., 983 F.2d 336, 340-41 & n.12 (1st Cir. 1993); In re Chung King, Inc., 753 F.2d 547, 549-50 (7th Cir. 1985).

We are in complete agreement with these general conventions, but we are also cognizant that an unwavering adherence to formality is not normally advisable in bankruptcy cases.  See Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.), 722 F.2d 1063, 1069 (2d Cir. 1983)("[A] bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code.").  Finality and regularity of proceedings are significant factors whenever the courts are involved in a sale of property, for devotion to those principles encourages fervent bidding and ensures that interested parties will sincerely extend their best and highest offers at the auction itself.  See In re Webcor, Inc., 392 F.2d 893, 899 (7th Cir. 1968)("If parties are to be encouraged to bid at judicial sales, there must be stability in such sales and a time must come when a fair bid is accepted and the proceedings are

ended."), <u>cert. denied</u>, 393 U.S. 837 (1968).  This, in turn, redounds to the benefit of bankruptcy estates in general by increasing a trustee's ability to command top dollar for items sold.

But these are not the only elements at play during bankruptcy sales. As a counterweight, the court must also remain mindful of the ubiquitous desire of the unsecured creditors, and a primary objective of the Code, to enhance the value of the estate at hand.  <u>See, e.g.,</u> <u>Metropolitan Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)</u>, 6 F.3d 492, 494 (7th Cir. 1993)("Section 365 . . . advances one of the Code's central purposes, the maximization of the value of the bankruptcy estate for the benefit of creditors.").  The existence of these competing considerations in judicial sales has not gone unheeded in the First Circuit, as that court has explained, in cases subsequent to <u>Gil-Bern</u>, that "th[e] policy [of inspiring confidence in sales under the supervision of the court] must be weighed against the purpose to be achieved by these judicial sales, which is to benefit the creditors and debtor."  <u>Munro Drydock, Inc. v. M/V Heron</u>, 585 F.2d 13, 14 (1st Cir. 1978).

In fact, <u>Gil-Bern</u> itself did not completely disregard the tightrope a bankruptcy judge must navigate when presiding over judicial sales.  The court there held that, absent any local rule to the contrary, the judge was constrained to confirm the highest bid submitted pursuant to the procedure described in the notice of sale.  <u>Gil-Bern</u>, 526 F.2d at 628-29.  Despite what the court viewed as the "prima facie meaning" of that notice, however, it determined that the judge's approval of a later bid would be affirmed if the bankruptcy court followed a known custom of allowing additional offers at confirmation hearings.  <u>Id.</u>  Underpinning this reasoning was the First Circuit's recognition that the participants in a judicial sale should receive what they have "reason to expect."  <u>Id.</u> at 628; <u>see also</u> <u>Munro Drydock</u>, 585 F.2d at 16 ("It is

11

important, in the ordinary case, to honor the expectations of those bidding at the sale."); In re Wintex, Inc., 158 B.R. 540, 545 (D. Mass. 1992)("[T]he hallmark of Gil-Bern is . . . fealty to bidders' expectations.").

By implicitly utilizing bidders' reasonable expectations as a guidepost in reviewing the propriety of a bankruptcy court's actions, the First Circuit charted what we feel is a logical path in balancing the need for finality against the interest in maximizing the estate's worth. The concern the emphasis on finality is intended to serve, encouraging confidence in judicial sales, is satisfied so long as members of the public are treated in an anticipated manner. Thus, employing a sliding scale approach, the importance of estate enhancement diminishes as an auction participant's reasonable expectations, and the gravity of finality, increase. At some point, such as when the court actually enters an order approving the sale, expectations become sufficiently crystallized so as to render it improper to frustrate anticipated results except in the limited circumstances where there is a grossly inadequate price or fraud in the conduct of the proceedings.[13] Cf. In re Musconqus Bay Co., 597 F.2d 11, 12 (1st Cir. 1979)("The policy favoring confirmation of a bankruptcy sale to the highest bidder at a fairly conducted public auction gives way to the goal of benefitting the bankrupt estate and its creditors when the sale price would be 'grossly inadequate.'"); Stanley, 164 F.2d at 318 (articulating modern rule). In other

---

This is not to say that the standard from Stanley is pertinent only when the court has actually entered a confirmation order. Numerous other scenarios can be envisioned in which the parties' expectations will be adequately solidified to justify additional bidding only upon proof of exceptional circumstances, but we need not attempt to enumerate each such set of events. Cf. In re Northern Star Indus., 38 B.R. 1019, 1022 (E.D.N.Y. 1984)(describing situation where no objections were received in response to notice of sale, and where, after learning that no party had objected, expectant buyer expended significant sums to improve subject property).

situations, where the sale had not progressed to a comparable plateau, a reviewing court should evaluate the bankruptcy judge's decisions on a case by case basis, with due regard both for the parties' expectations and the judge's broad discretion to weigh the multifarious interests involved.

To summarize, we think that the important notions of finality and regularity in judicial auctions are appeased if the court acts consistently with the rules by which the particular sale is conducted and in compliance with the bidders' reasonable expectations.  See Consumer News & Bus. Channel Partnership v. Financial News Network, Inc. (In re Financial News Network, Inc.), 980 F.2d 165, 170 (2d Cir. 1992)(commenting that submission of post-auction proposal was consistent with both the rules of the auction and the participants' expectations).  We realize that this is a deferential standard, but we feel it provides the bankruptcy court, in the first instance, with ample latitude to strike a satisfactory balance between the relevant factors of fairness, finality, integrity, and maximization of assets.  "The bankruptcy court must be accorded sufficient discretion to decide the truly close cases as best it can in view of these competing considerations."  Musconqus, 597 F.2d at 13; see also Financial News, 980 F.2d at 170 ("There are cases where the bankruptcy court's discretion must be sufficiently broad so that in making its decision it can compass these competing considerations as best it can.").

Turning, then, to the facts before us, we conclude that the bankruptcy court acted within its wide discretion when it accepted bids after announcing its intention to approve the proffered Purchase Agreement. As a preliminary matter, it is significant that the judge chose to adopt a very informal and flexible bidding process, and to the extent the method used can even be called an auction, it was an auction marked by a lack of applicable rules and

guidelines.[14]  Unlike <u>Gil-Bern</u> and other similar cases, there was no definite time by which the court required parties to submit offers, and, prior to the judge's announcement, Schnuck had no notice that cessation of bidding was imminent.  Literally seconds following the court's "surprise" statement, Schnuck tendered what was ultimately its best and final proposal.  Given these events, we are comfortable that this is not a situation in which a potential buyer purposely bided its time during the auction, taking an opportunity to survey the landscape of the sale, only later to submit an upset bid at the lowest possible price.  <u>Cf.</u> <u>Stanley</u>, 164 F.2d at 319 ("This unwillingness [to upset a judicial sale at auction] results from the effect upon such sales of knowing that a prospective bidder may abstain from bidding at the auction . . . and may then outbid the price at which the property has been struck down.")(quotation omitted).  Instead, Schnuck obeyed what it perceived to be the rules of the sale, and its $2.1 million submission was untimely only in light of the court's unforeseeable declaration.

Also, we cannot say that the court's decision to entertain additional offers was inconsistent with Four B's justifiable expectations.  Four B knew, and contractually acknowledged, that assignment of the lease was subject to bankruptcy court approval, and it protected itself against unfavorable consequences by bargaining for bid protection features in the Purchase Agreement.  These facts, especially when viewed in tandem with the bankruptcy

---

The attorneys present at the hearing noted and even lamented this dearth of governing rules.  <u>See, e.g.,</u> Transcript of Hr'g at 79-80 ("And, in fact, we would love to see the Court establish what procedures we follow in the future so that we don't get into this mess again.").  Under appropriate circumstances, a complete lack of standards, resulting in chaos, could conceivably give rise to an independent claim that the court abused its discretion, but this is not such a case.

judge's known propensity to auction estate property in open court,[15] make it highly likely that Four B had an acute awareness of the possibility that the court might, on the day of the hearing, consider additional proposals for this apparently valuable commodity. We are therefore convinced that, though Four B may have had some fledgling expectation to procure the assignment if all went well at the hearing, it was not nearly mature enough to render the bankruptcy judge's decision an abuse of discretion.

We also reject the notion that acceptance of further bids was reversible error due to any expectation that may have developed during the hearing itself. Notably, Four B learned when the proceedings began that it had been outbid, and it would assuredly be counterintuitive to suggest as a general proposition that a low bidder has a supportable expectation to receive property on the auction block. See Wintex, 158 B.R. at 545 ("A high bidder expects to win the bid under ordinary circumstances . . . ."). While the court's declaration of an intention to approve the Purchase Agreement, if left unchallenged, would almost certainly have led to crystallization of Four B's expectations, the announcement was met forthwith by Schnuck's offer to increase its bid by $500,000. A recess ensued, and we would be hard pressed to hold that the few seconds during which Four B considered itself the victor were of such significance to preclude the bankruptcy court from entertaining an alternative that would substantially benefit the estate.

---

The bankruptcy judge himself remarked that "out-of-town counsel are probably not aware of my proclivities. I love to sell in the courtroom. . . . Had several auctions in my tenure." Transcript of Hr'g at 64. It seems, though, that the judge underestimated his reputation, as Schnuck's attorney, who practices in St. Louis, divulged that even he was aware of the judge's penchant for holding auctions in court. See Transcript of Hr'g at 82 ("[Y]ou've got a reputation for holding auctions. [I c]ertainly expected to have an auction here.").

We have no doubt that Four B possessed some inchoate expectation to obtain the assignment for $1.5 million. The company knew that procurement of the lease was not a foregone conclusion, however, and it protected itself against harm should its attempts have gone awry. Accordingly, for the reasons already discussed, we are of the opinion that the company's expectations had not progressed to a level which should have prohibited the solicitation of additional bids except under the standard explicated in Stanley. This case is a classic example of the challenges confronted by the bankruptcy court in making decisions that incorporate, and attempt to mollify, each of the antagonistic considerations relevant to a sale of estate property. It is in the best interest of our bankruptcy system to allow learned bankruptcy judges to make these value determinations unrestrained by an unwarranted fear of reversal should another court appraise the balance slightly differently. With this precept in mind, we do not think that the bankruptcy judge's actions constituted an abuse of his broad discretion.[16]

---

Another body of law lends support to the bankruptcy court's decision to consider Schnuck's $2.1 million offer. Although the court uses a business judgment test in deciding whether to approve a trustee's motion to assume, reject, or assign an unexpired lease or executory contract, this entails a determination that the transaction is in the best interest of the estate. See Nostas Assocs. v. Costich (In re Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996)("Th[e] decision [to allow a debtor to assume an unexpired lease] required a judicial finding -- up-front -- that it was in the best interests of the estate (and the unsecured creditors) for the debtor to assume the lease . . . ."). Where the trustee's request is not manifestly unreasonable or made in bad faith, the court should normally grant approval "[a]s long as [the proposed action] appears to enhance [the] debtor's estate." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309 (5th Cir. 1985) (quotation omitted). Had the court blindly proceeded to enter an order confirming the original Purchase Agreement without giving the slightest thought to Schnuck's substantially higher bid, it might have been accused of dereliction in its duty to guarantee that the particular assignment was in the best interest of the estate and the unsecured creditors.

## D. Four B's Contractual Right to Match Competing Offers

Finally, Four B alleges that the bankruptcy court committed reversible error by refusing to respect its contractual right to match Schnuck's $1.6 million offer. As we understand this argument, Four B claims that the right of first refusal granted by the Purchase Agreement afforded it the option to complete the sale by matching a competing suitor's <u>first</u> offer. Under this theory, Schnuck's $2.1 million proposal was, for practical purposes, void, and the bankruptcy court was wrong to "ignore" Four B's prerogative to close the deal by matching Schnuck's initial $1.6 million submission.

We do not read the contract's match provision as broadly as Four B. The operative paragraph indicates that the company enjoyed the "opportunity to match all competing bids," but it says absolutely nothing about limiting Food Barn's ability to entertain multiple offers from the same party. The express terms of the Purchase Agreement gave Four B the privilege to secure assignment of the lease by equalling another bidder's offer, and the bankruptcy court scrupulously honored this aspect of the bargain. Four B obtained the lease by matching Schnuck's $2.1 million submission, and it has no foundation from which to argue that the court "ignored" the bid protection feature.

In any event, we would be extremely reluctant to hold a bankruptcy court to the particulars of the right of first refusal envisioned by Four B. Some amount of bid protection is, of course, permissible under the Code, and the trustee is not normally required to seek court approval before in good faith entering into an agreement which includes a right of first refusal. <u>See</u> <u>In re Table Talk, Inc.</u>, 53 B.R. 937, 942 (Bankr. D. Mass. 1985). "A contrary position might discourage potential buyers from negot[i]ating with trustees, thereby forcing down the market value of the bankruptcy estate['s] property in general." <u>Id.</u> Still, it

would be unwise to allow the parties to hamstring the court's discretion to implement bidding procedures it deems to be fit under the circumstances. The bankruptcy judge must retain the capability to conduct sales in a manner that most benefits the bankruptcy estate, and we would be loath to accept any contractual provisions that purport to limit this authority.

## III.  CONCLUSION

Because the bankruptcy court did not commit reversible error when it required Four B to remit $2.1 million for the lease assignment, we affirm.

AFFIRMED.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.