# In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 02-3088

CORPORATE ASSETS, INC.,

*Appellant*,

v.

GUS A. PALOIAN, Chapter 7 Trustee of
GGSI LIQUIDATION, INC., et al.,

*Trustee-Appellee*,

and

GOSS INTERNATIONAL CORPORATION,

*Intervenor-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 02 C 2056—**Elaine E. Bucklo**, *Judge.*

_____

ARGUED MAY 13, 2003—DECIDED MAY 17, 2004

_____

Before ROVNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

ROVNER, *Circuit Judge.* At an auction sanctioned by the bankruptcy court, Corporate Assets, Inc. ("CAI") submitted the high bid for assets belonging to the debtors, but its apparent victory proved short-lived. A higher, "upset" bid

tendered to the debtors after the close of the auction convinced the debtors, with the bankruptcy court's approval, to reopen the bidding. CAI won the second auction with a bid $352,500 higher than its original bid. CAI appealed the bankruptcy court's decisions to reopen the bidding and to confirm the sale to CAI at the higher price established by the second auction. The district court affirmed. *In re GGSI Liquidation, Inc.*, 280 B.R. 425 (N.D. Ill. 2002). CAI has now appealed to this court, contending that the bankruptcy court abused its discretion in allowing a second auction and in refusing to confirm the results of the first auction. We also affirm.

## I.

On September 10, 2001, debtors Goss Holdings, Inc. and Goss Graphic Systems, Inc.[1] (collectively, "Goss") filed voluntary chapter 11 bankruptcy petitions (later consolidated) with the bankruptcy court. Shortly thereafter, the debtors sought approval from the court to sell by auction certain personal property (including newspaper printing press manufacturing equipment, furniture, and fixtures) located at Goss's manufacturing facility in Cedar Rapids, Iowa (the "Cedar Rapids assets" or the "assets").

On December 20, 2001, the bankruptcy court entered an order approving specific bidding procedures for the auction and sale of the Cedar Rapids assets. R. 4 Tab 3 & Ex. A. Pursuant to these rules, each interested party was to submit a written bid to Goss in advance of the auction along with an executed copy of an asset purchase agreement that Goss had prepared, financial data demonstrating that it had the financial ability to consummate the asset purchase,

---

[1] Goss Graphic Systems, Inc. later changed its name to GGSI Liquidation, Inc.

and a deposit. *Id.* Ex. A at 2-3. Goss was in turn empowered to review these submissions and determine whether each bidder was "qualified" in the sense of having submitted the requisite materials and having demonstrated its bona fides and ability to make good on its offer. *Id.* Ex. A at 1-2. Goss was then to conduct an auction among qualified bidders on January 21, 2002, at which time those bidders would have the opportunity to increase the amounts of their bids. *Id.* Ex. A at 4. Upon conclusion of the auction, Goss, in consultation with its pre- and post-petition lenders and the committee of its unsecured creditors, was to ascertain the highest and best offer and present that bid to the bankruptcy court for approval at a sale hearing scheduled for January 23, 2002. *Id.* Ex. A at 4-5. However, Goss's recommendation that the court approve a particular offer was not to be taken as an acceptance of that offer; only the court's approval of an offer was to be so construed. *Id.* Ex. A at 5. A modifications provision included in the approved procedures also gave Goss substantial discretion to reject any bid and/or to impose additional conditions and terms on the sale of its property prior to the sale hearing:

### Modifications

Goss may (a) determine, with the agreement of representatives of the [pre- and post-petition] Lenders and the Committee [of unsecured creditors], which Qualified Bid(s), if any, is the highest or otherwise best offer; and (b) reject at any time before entry of an order of the Bankruptcy Court approving a Qualified Bid, any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the bidding procedures, or the terms and conditions of sale, or (iii) contrary to the best interests of Goss, its estate[ ], and its creditors. At or before the Sale Hearing, Goss may impose such other terms and conditions

> as it may determine to be in the best interests of Goss'
> estate, its creditors and other parties in interest.

*Id.* Ex. A at 6.

Included in the draft purchase agreement that bidders were to execute in advance of the auction was a term concerning the removal of the Cedar Rapids assets from Goss's property. R. 4 Tab 3 Ex. B. at 5-6, § 5.1. That provision required the purchaser to remove the bulk of the assets from the property on or before June 1, 2002. *Id.* However, noting that Goss was attempting to sell the property, the agreement reserved to Goss the right to require removal of the assets prior to June 1 in the event that the property was sold. *Id.* A number of interested bidders expressed concern to Goss about that reservation, and some submitted written bids conditioned on deletion of that language from the purchase agreement. R. 4 Tab 4 at 9.

After becoming aware of the concerns that prospective bidders had about the early-removal provision, Goss decided that it would delete that provision from the asset purchase agreement. By this time Goss had, in fact, contracted to sell the Cedar Rapids facility to a third party. Goss arranged to sublease the property from the new owner until June 1 at a cost of $115,000, so that the eventual purchaser of the Cedar Rapids assets would not be forced to remove them from the property before that date. R. 4 Tab 9 at 13. In the week prior to the auction, Goss advised some, but not all, of the bidders on the assets that the purchase was no longer subject to the early-removal term (*see* R. 4 Tab 6 at 18-19, 24-25; R. 4 Tab 9 at 22-23); the rest were informed of the change at the time of the auction (*see* R. 4 Tab 4 at 8-10). Goss would later advise the bankruptcy court that once it informed (some of) the prospective bidders that the Cedar Rapids assets would not have to be removed prior to June 1, the bid amounts on the assets jumped from a high of approximately $1.6 million to $2.2 million. R. 4 Tab 9 at 13.

The auction proceeded as scheduled on Monday, January 21, 2002. After the amounts of the written bids that Goss had received were announced at the start of the auction, qualified bidders were given the opportunity to increase their bids. Before opening the floor to further bids, however, Goss's attorney solicited questions from the bidders. One of the bidders asked, "Will this be final today, or will someone be able to go to the court date three days from now and up our bid?" R. 4 Tab 4 at 15. Goss's attorney responded as follows:

> Well, the Court's order provides that today is the day for the auction, and when we close the auction it will be final. I cannot obviously state that someone can't walk into court on Wednesday [the day scheduled for the sale hearing] and offer 10 million dollars for the stuff and have the Court say that it's not going to accept their bid; but under the procedures, today is the day for the auction.
>
> The debtors anticipate that when they close the auction today, they will take the lead bidder who has provided all of the necessary information and deposits to be a qualified bidder and will present that to the Court to approve.
>
> So I guess I can't give you 100 percent assurances that someone can't walk into court on Wednesday and try to outbid whoever wins today, but I think that is a very slim possibility.

*Id.* at 15-16.

Of the written bids that had been submitted to Goss in advance of the auction, CAI's was the highest, in the amount of $2.25 million. When the bidding was reopened at the auction, none of the other bidders topped that bid. Several did increase their bids, but only in an apparent effort to secure second place behind CAI's high bid. Myron Bolling Auctioneers ("MBA") ultimately secured the second-

place slot, with a bid of $2.075 million. At the close of bidding, Goss's counsel indicated that the final bids of the four qualified bidders would be submitted to the bankruptcy court at the sale hearing scheduled for January 23 and that Goss would expect to close on the sale on the following day. *Id.* at 29-30, 33-34. Goss's attorney also advised the bidders that if any of them wished to object to the sale process, they must file their objections no later than 4:00 p.m. on the day prior to the sale hearing. *Id.* at 33. The auction was then declared closed. *Id.* at 34.

The next day, January 22, MBA's representative, Myron Bolling ("Bolling") contacted Goss and indicated that MBA wished to increase its bid to $2.45 million, an amount $200,000 or just under nine percent greater than CAI's high bid. MBA had not known prior to the auction that Goss had decided to remove from the purchase agreement the language permitting Goss to require removal of the Cedar Rapids assets prior to June 1. *See* R. 4 Tab 6 at 18-19, 24-25; *see also* R. 4 Tab 4 at 10 (after Goss's counsel announces removal of that sale condition, Bolling asks him to clarify when assets would have to be removed). Evidently, during the auction, Bolling and another MBA representative were able to communicate this information to some, but not all, of the members of the MBA bidding group who were not present at the auction. R. 4 Tab 6 at 25; R. 4 Tab 9 at 14-15, 21. Following the auction, when everyone in the MBA group became aware of the change, they decided to increase MBA's bid.

Presented with the higher offer from MBA, Goss, with the concurrence of its lenders and the committee of unsecured creditors, decided that it would ask the bankruptcy court to continue the sale hearing scheduled for January 23 so that it could conduct a second auction. The bankruptcy court granted the request and rescheduled the hearing for January 29, 2002, reserving judgment as to whether it would accept the results of the second auction or instead

confirm the sale to CAI based on its winning bid at the first auction. R. 4 Tab 10 at 9. Goss then set January 24, 2002, as the date of the second auction and notified the bidders.

CAI participated in the second auction, subject to a full reservation of its legal rights, and subsequently won with a final bid of $2.6025 million, an amount approximately 15.7 percent higher than its previous bid. At the sale hearing on January 29, 2002, the debtors requested that the bankruptcy court confirm the results of the second auction and declare CAI the winner based on its high bid at that auction. CAI objected, arguing that the results of the first auction should be confirmed with CAI as the winning bidder at a price of $2.25 million. CAI also submitted an administrative expense claim seeking compensation for the costs it had incurred as a result of the second auction. *See* 11 U.S.C. § 503(b)(1)(A).

The bankruptcy court (Hon. Carol A. Doyle) granted Goss's request to confirm the results of the second auction and denied CAI's request for expenses. R. 4 Tabs 2, 6. The court was mindful of the need to preserve the integrity and finality of the auction process and to recognize the reasonable expectations of the parties who participated in the first auction. R. 4 Tab 6 at 20. On the other hand, the court also had to consider the governing principle in confirming a sale, which is to secure the highest price for the benefit of the estate and creditors. *Id.* (citing *In re Chung King, Inc.*, 753 F.2d 547, 549 (7th Cir. 1985)). Accepting CAI's winning bid at the second auction was in the best interests of the estate—that bid was more than $350,000 higher than CAI's bid at the first auction. *Id.* at 22. And after weighing the circumstances, the court was satisfied that confirming the results of the second auction was contrary neither to the reasonable expectations of the bidders nor the integrity and finality of the auction process. *Id.* The modifications provision of the bidding procedures had given Goss the authority to reject a bid not in the best interests of the

estate at any time before the court entered an order approving a qualified bid; it had also empowered Goss to impose additional conditions in the interests of the estate prior to or at the sale hearing. In the court's view, Goss's decision to reject CAI's high bid at the first auction and to reopen the auction to further bidding "would fit within that very, very broad language." *Id.* at 23. CAI had been aware of the bidding procedures, including the modifications provision, and so to the extent CAI expected that its high bid at the first auction necessarily would be approved, its expectation was unreasonable. *Id.* at 23-24. Likewise, because the bidding procedures granted Goss the authority to reject any bid until such time as the court had entered a sale order, the decision to reopen the auction did not undermine the interests in finality and integrity of the auction process. *Id.* at 24. Moreover, in the court's view, the second auction provided a more level playing field than the first had done. *Id.* at 24-25. Prior to the first auction, some but not all bidders had been made aware of Goss's decision to remove the language that might have required removal of the Cedar Rapids assets prior to June 1. MBA did not learn of the change until the day of the auction and was not able to inform all of the members of its bidding group until after the auction had concluded. *Id.* at 25. For these reasons, the court concluded that it was appropriate to confirm CAI's winning bid at the second auction rather than the first. *Id.* at 26. Because the court had overruled CAI's objection to the second auction, the court found no ground on which to compensate CAI for the fees it had incurred in pursuing that objection or for the difference between its first and second bids. *Id.*

CAI appealed the bankruptcy court's decision to the district court. Soon after that appeal was filed, the proceedings in the bankruptcy court were converted from Chapter 11 to Chapter 7 proceedings.

The district court (Hon. Elaine E. Bucklo) affirmed the bankruptcy court's decision. *In re GGSI Liquidation, Inc.*, 280 B.R. 425 (N.D. Ill. 2002). The district court recognized that when a bankruptcy court is asked to confirm the results of an auction, it is faced with two competing interests: "the integrity and finality of public auctions and the best interests of the bankruptcy estate's creditors." *Id.* at 428 (citing *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564 (8th Cir. 1997)). The former interest is satisfied if a court acts in a manner consistent with the rules by which the auction has been conducted and in compliance with the reasonable expectations of the bidders. *Id.* at 429 (quoting *Food Barn*, 107 F.3d at 565). Although in this case the bidding procedures approved by the bankruptcy court contemplated one auction rather than two, the modifications provision authorized Goss to reject any bid not in the best interests of the estate and its creditors, to review the bids in light of those interests before making a recommendation to the bankruptcy court, and to impose other terms and conditions on the sale at any time up to and during the sale hearing. At the same time, the approved procedures did not specify any cut-off beyond which Goss could no longer accept bids. The bankruptcy court therefore had correctly concluded that Goss acted within the rules when it reopened the bidding. *Id.* Goss had not departed from the bidders' reasonable expectations in taking this step. *Id.* at 429-30. All of the bidders had received a copy of the approved procedures prior to the auction, and although Goss's counsel had informed bidders that the results of the (first) auction were likely to be final, he had also told them that he could not give them "100 percent assurances" on that score. Thus, CAI's expectations that its high bid at the first auction would be accepted were not "'adequately solidified'" so as to demand a showing of fraud or gross inadequacy before the bidding could be reopened. *Id.* at 430 (quoting *Food Barn*, 107 F.3d at 565 n.13). The court agreed with the bankruptcy court that the second auction was in the best

interests of the estate and Goss's creditors. *Id.* The approximately 16 percent differential between CAI's high bids at the first and second auctions, although perhaps insufficient to demonstrate gross inadequacy in the original bid (*see Chung King*, 753 F.2d at 550), was nonetheless a "significant boon" to the estate. *Id.* The bankruptcy court thus was within its discretion to conclude that the benefit to the estate in the second auction outweighed the bidders' expectations as to the results of the first auction and the interest in the finality and integrity of public auctions. *Id.* Finally, because Goss's position with respect to the validity of the second auction was not frivolous and because the bankruptcy court had properly accepted the results of the second auction, the district court concluded that "fundamental fairness" did not require CAI to be compensated for the legal fees it incurred in opposing the second auction or for the greater price it had to pay for the Cedar Rapids assets as a result of the second auction. *Id.* (quoting *In re Met-L-Wood Corp.*, 115 B.R. 133, 135-36 (N.D. Ill. 1990)). It therefore sustained the denial of CAI's administrative expense claim. *Id.*

## II.

In reviewing the district court's decision to affirm the bankruptcy court, we employ the same standard of review that the district court itself used. *E.g.*, *Frierdich v. Mottaz*, 294 F.3d 864, 867 (7th Cir. 2002). The bankruptcy court's confirmation or refusal to confirm an asset sale will only be overturned in extreme cases, when the bankruptcy court has abused its discretion. *In re Chung King, Inc.*, 753 F.2d 547, 549 (7th Cir. 1985). Generally speaking, a court abuses its discretion when its decision is premised on an incorrect legal principle or a clearly erroneous factual finding, or when the record contains no evidence on which the court rationally could have relied. *See United States v. Jain*, 174

F.3d 892, 899 (7th Cir. 1999); *Salgado by Salgado v. General Motors Corp.*, 150 F.3d 735, 739 & n.4 (7th Cir. 1998).

As the lower courts recognized, two principal interests come to the fore when a bankruptcy court is asked to confirm the results of a judicial sale. "The governing principle at a confirmation proceeding is the securing of the highest price for the bankruptcy estate." *Chung King*, 753 F.2d at 549. A central purpose of bankruptcy, after all, is to maximize creditor recovery. *E.g.*, *Precision Indus., Inc. v. Qualitech Steel SBQ, LLC*, 327 F.3d 537, 548 (7th Cir. 2003). But there is also an interest in the finality and integrity of the process by which bids are accepted and approved. " 'If parties are to be encouraged to bid at judicial sales[,] there must be stability in such sales and a time must come when a fair bid is accepted and the proceedings are ended.' " *Chung King*, 753 F.2d at 550 (quoting *In re Webcor, Inc.*, 392 F.2d 893, 899 (7th Cir. 1968)); *see also Shlensky v. H.R. Weissberg Corp.*, 410 F.2d 1182, 1185-86 (7th Cir. 1969). A tension arises between these two interests where, as here, someone makes a higher, upset bid after the auction has concluded and bidding has formally closed. Accepting a late bid may mean more money for creditors in the short run, but by upsetting the expectations of those who thought the bidding was at an end, it may in the long term undermine confidence in judicial sales and discourage prospective purchasers from making their best offers in a timely manner. *See Chung King*, 753 F.2d at 554. "[R]efusing to confirm a sale to a high bidder merely because an intervening higher bid has been received is the surest way to destroy confidence in judicial sales and defeat the purpose sought to be accomplished thereby to realize the greatest amount from such sales to those entitled to receive the proceeds thereof." *J.J. Sugarman Co. v. Davis*, 203 F.2d 931, 932 (10th Cir. 1953). A bankruptcy judge confronted with this scenario thus faces the unenviable task

of "walk[ing] a tightrope" between the competing interests. *In re Financial News Network Inc.*, 980 F.2d 165, 166 (2d Cir. 1992); *see also In re Food Barn Stores, Inc.*, 107 F.3d 558, 565 (8th Cir. 1997).

The cases dealing with upset bids reflect a continuum, along which the bankruptcy court's discretion to reopen the bidding in pursuit of estate maximization diminishes as the sale comes closer to becoming a fait accompli and as the expectations of the participants solidify. *Food Barn*, 107 F.3d at 565. Once a court has confirmed the sale of the debtor's assets to the auction's victor, for example, the public interest in finality is high and the parties reasonably expect that the bidding is over. *Id.* At that juncture, only a narrow range of circumstances will support a court's decision to vacate the sale order and reopen the bidding. The simple fact that a late bid offers the estate more money than the bid previously approved by the court will not suffice; only if the belated bid reveals the initial sale price to be "so grossly inadequate as to shock the conscience of the court," *Chung King*, 753 F.2d at 550, or if the original auction was tainted by fraud, mistake, or some comparable defect, *Webcor*, 392 F.2d at 899, will a court be justified in setting aside a confirmed sale. *See also Food Barn*, 107 F.3d at 565; *In re Irvin*, 950 F.2d 1318, 1320-21 (7th Cir. 1991). On other hand, "where the sale ha[s] not progressed to a comparable plateau," the bankruptcy court enjoys broader discretion to decide whether to entertain a late bid, and its judgment in that regard commands commensurate deference from the reviewing court. *Food Barn*, 107 F.3d at 565. For example, where the bidding for a debtor's property is "complex and fluid," *Financial News*, 980 F.2d at 170, or where it is "informal and flexible," *Food Barn*, 107 F.3d at 566, and where the court has not yet approved sale to a particular bidder, the court might appropriately conclude that consideration of a late bid would not unduly frustrate the reasonable expectations of the participants or compro-

mise the integrity of the process. *Id.* at 565-66; *Financial News*, 980 F.2d at 170. In that setting, financial gain for the estate and its creditors might suffice as a basis for reopening the bidding without an additional showing that the initial bids were grossly inadequate or that the original bidding was tainted by fraud or some other irregularity. *Food Barn*, 107 F.3d at 567.

In this case, the bankruptcy court had not yet confirmed the results of the first auction when it continued the sale hearing so that Goss could conduct a second auction. Our cases reflect the significance of the confirmation order vis-à-vis the parties' reasonable expectations and the interest in the finality and regularity of the sale process. We have repeatedly cited the entry of a sale order as the point at which the court loses much of the discretion it otherwise enjoys in deciding whether to confirm the results of the auction and at which it must be able to identify a compelling reason in order to recognize a late bid. *Irvin*, 950 F.2d at 1320-21; *Chung King*, 753 F.2d at 549-50; *Webcor*, 392 F.2d at 899; *In re Marathon Foundry & Mach. Co.*, 239 F.2d 122, 130 (7th Cir. 1956). That is not to say that the bankruptcy court enjoys unbounded authority in *any* circumstance to accept additional bids so long as it has not yet entered a sale order, *see Food Barn*, 107 F.3d at 565 n.13; *Financial News*, 980 F.2d at 169-70, but it is to say that until that point, the court enjoys broader discretion to balance the goal of estate maximization against the interest in regularity and finality and the parties' expectations.

CAI contends that, notwithstanding the lack of a sale order, once the first auction had closed with it as the high bidder, it had every reason to think that the bidding was done and that the court's approval was but a formality, so that it was an abuse of discretion for the bankruptcy court to allow Goss to conduct a second auction based on MBA's upset bid. CAI's position is not entirely without support in

the facts. The bidding procedures, and the court's order approving those procedures, envisioned a single auction, as the bankruptcy and district courts both recognized. R. 4 Tab 3 at 2 ¶ 3 & Ex. A at 4-5. When asked at the auction about the finality of the bidding, Goss's counsel informed the bidders that "when we close the auction it will be final." R. 4 Tab 4 at 15. Counsel did go on to qualify that statement somewhat, noting that he could not entirely rule out the possibility that the court might entertain a dramatically higher upset bid at the sale hearing; but he saw that as "a very slim possibility." *Id.* at 16. The auction proceeded in a straightforward matter, and it was clear from the moment when the written bids were disclosed at the start of the hearing until the bidding closed that CAI's was the high bid. At the close of the auction, neither Goss's counsel nor any other participant said anything suggesting that further bidding was anticipated. This was not, in the parlance of *Financial News*, a "complex and fluid" bidding process that left the participants uncertain as to what could be expected next. 980 F.2d at 170; *see also Food Barn*, 107 F.3d at 566.

In view of these circumstances, CAI urges us to follow *In re Gil-Bern Indus., Inc.*, 526 F.2d 627 (1st Cir. 1975), and hold that the bankruptcy court abused its discretion in permitting a second round of bidding. The bankruptcy court in *Gil-Bern* had issued a notice inviting bids on the debtor's property to be submitted in writing by a fixed date and time, with a sale hearing to follow several hours later. The appellant had submitted the high bid as of the specified deadline. However, when the parties appeared in court for the sale hearing, a second bidder sought leave to make a higher bid. The bankruptcy court allowed it to do so, and under protest, the appellant then made a new bid of its own to best its competitor. The court then confirmed the sale to the appellant on its final bid. On appeal, the First Circuit vacated the sale order out of concern that the bankruptcy court's decision to reopen the bidding was contrary to the

reasonable expectations of the participants. The notice calling for bids on the property had specified a day and time as of which the bidding would close, and although the high bid as of that deadline was subject to the bankruptcy court's approval, there was no suggestion that the appellant's initial bid was inadequate, such that the bankruptcy court would have been entitled to reject it outright. *See id.* at 628-29. Nor was there even a substantial disparity between that bid and the belated upset bid; instead, the bankruptcy court had reopened the bidding simply because the upset bid was modestly greater than the appellant's timely bid. *Id.* The First Circuit viewed this as an unfair and imprudent step, barring some established practice of entertaining late bids that would have placed the appellant on notice that its timely offer remained subject to further bidding at the confirmation hearing:

> If there is no local custom to the contrary, we are in accord with the established rule that it is an abuse of discretion for a bankruptcy court to refuse to confirm an adequate bid received in a properly and fairly conducted sale merely because a slightly higher offer has been received after the bidding is closed. It might not only be thought improper for a bankruptcy court to proceed in an irregular fashion merely to gain a few extra dollars in one case, but in the long run such a practice would be penny wise and pound foolish. Creditors in general would suffer if unpredictability discouraged bidders altogether. At the least such practices might encourage low formal bids. We would not approve such a procedure. . . .

*Id.* at 629 (citations omitted). The court remanded the case to the district court for an assessment as to whether there was, in fact, a local practice that would have justified the bankruptcy court's decision to receive additional bids at the confirmation hearing. *See id.*

We decline to draw from *Gil-Bern* a hard and fast rule precluding a bankruptcy court from entertaining an upset bid on a debtor's property once an auction has concluded or the deadline for offers has passed. Courts that have considered *Gil-Bern*, including the First Circuit itself, have cautioned against a such a rigid application of its rationale. *See In re Muscongus Bay Co.*, 597 F.2d 11, 13 (1st Cir. 1979); *see also Food Barn*, 107 F.3d at 564-65; *Financial News*, 980 F.2d at 170. These courts have emphasized that bankruptcy courts face a difficult task in weighing the competing interests implicated by upset bids and that they must be accorded maximum discretion in striking an appropriate balance. *Financial News*, 980 F.2d at 169 ("[*Gil-Bern*] should not be blindly applied so as to reduce the broad discretion and flexibility a bankruptcy court must necessarily have to enhance the value of the estates before it"); *see also Food Barn*, 107 F.3d at 565-66; *Muscongus Bay*, 597 F.2d at 13. Moreover, *Gil-Bern* itself recognized that the perceived finality of a sale does not turn entirely on the formal close of bidding. Rather, the court held out the possibility that local custom might allow for late bids to be made at the sale hearing itself, thus postponing a reasonable belief in the finality of the process until after the court had itself confirmed the sale to the high bidder. 526 F.2d at 629. No such custom has been established here, but there are other circumstances which would have alerted bidders to the possibility that the results of the first auction were not necessarily final.

As the bankruptcy and district courts both emphasized, the modifications provision of the bidding procedures, of which CAI and the other bidders were aware, bestowed on Goss broad discretion to reject any bid and to impose additional conditions on the sale of the Cedar Rapids assets right up to the moment of the sale hearing. R. 4 Tab 3 Ex. A at 6. The reservation of this discretion to Goss would have tempered any expectation at the close of the first auction

that the Cedar Rapids assets necessarily would be sold to CAI in view of its high bid. *See Shipe v. Consumers' Serv. Co.*, 29 F.2d 321, 322 (7th Cir. 1928); *accord J.J. Sugarman*, 203 F.2d at 933-34; *see also In re WPRV-TV, Inc.*, 983 F.2d 336, 342 (1st Cir. 1993). Moreover, Goss's counsel did not accept CAI's high bid at the close of the first auction, nor did he formally declare CAI the winner. *See Sugarman*, 203 F.2d at 934. Although it is evident from a review of the record that counsel expected to recommend approval of CAI's bid (*see* R. 4 Tab 4 at 15-16, 29-30), the bidding procedures themselves clearly stated that the presentation of a particular bid to the court did not constitute acceptance of that bid. R. 4 Tab 3 Ex. A at 5. "Goss will be deemed to have accepted a bid *only* when a bid has been approved by the Bankruptcy Court at the Sale Hearing." *Id.* (emphasis ours).

It is also significant that, as the bankruptcy court found, the first auction did not occur on an entirely level playing field. Not everyone knew, prior to the first auction, that Goss had decided to delete from the purchase agreement the provision entitling it to insist on early removal of the purchased assets. Apparently, those bidders who had expressed concern to Goss about the provision had been advised of Goss's decision to get rid of it during the week prior to the auction. Others, like MBA, first learned of the revision at the auction itself. MBA later represented to the bankruptcy court that the individuals who participated in the auction on MBA's behalf were not able to contact all members of the bidding group to advise them of this new information until after the auction had concluded. Once the bidding group as a whole was aware that the Cedar Rapids assets would not have to be removed prior to June 1, MBA decided that it was willing to offer more money for those assets. None of this is disputed by CAI, and the record gives us no reason to believe that MBA's explanation for its late bid was not genuine. To the contrary, the record in several

respects tends to confirm that this revision to the terms of the sale was regarded as highly material by the bidders. As we noted earlier, some of the bidders had not only criticized the early-removal provision, but had gone so far as to condition their original written bids on the excision of this term from the asset purchase agreement. Toward that end, Goss itself was willing to expend $115,000 to sublease the property from the new owner. And, according to Goss, after it informed bidders that it would accede to their demand, bid amounts on the Cedar Rapids assets increased from a high of around $1.6 million to about $2.2 million. Finally, after Goss's counsel announced the revision at the outset of the auction, it was one of MBA's representatives—Bolling—who followed up with a request that counsel clarify when the assets would have to be removed from the Cedar Rapids facility. Collectively, these facts bear out the notion that the removal term was important to MBA as it was to the other bidders, and that it was the late hour at which MBA learned of the term's removal, rather than any nefarious intent to withhold its best bid until after the auction closed, that explained its upset bid. *See Food Barn*, 107 F.3d at 566 ("we are comfortable that this is not a situation in which the potential buyer purposely bided its time during the auction, taking an opportunity to survey the landscape of the sale, only later to submit an upset bid at the lowest possible price"); *Financial News*, 980 F.2d at 170 (noting that, under the circumstances, upset bid was not an attempt "to circumvent the auction process").

Finally, MBA's upset bid offered significantly more money to Goss's estate. The bid was $200,000 more than CAI's high bid at the first auction, an increase of roughly nine percent. That percentage likely would not be enough of a difference to justify a decision to reopen the bidding if the bankruptcy court had already entered an order confirming the sale to the winning bidder at the first sale. *See Chung King*, 753 F.2d at 550-51 ("Relatively small differences, such as in the present case [8.6 percent] have been ex-

pressly found not to shock the conscience of the court and not to cause the original confirmed sale price to be viewed as grossly inadequate."). But that is not the situation we have here. The court had not yet approved the sale to CAI when Goss informed the court of MBA's upset bid and asked the court to postpone the sale hearing so that a second auction could be held. The much greater threshold that would have to be crossed in order to justify setting aside a confirmation order thus did not apply. *See Food Barn*, 107 F.3d at 567.

The bankruptcy court, in sum, was presented with a request that it postpone the sale hearing so that Goss could conduct a second auction and entertain additional bids on its property. Goss made that request after consultation with its lenders and the committee of unsecured creditors. The request itself was premised on MBA's upset bid, which offered significantly more money for the Cedar Rapids assets than CAI's high bid at the first auction. The tardiness of this bid was explained by the fact that MBA, in contrast to other bidders, did not know prior to the auction of a material revision to the terms of the asset purchase agreement. MBA had tendered its upset bid on the day following the first auction, before the results of that auction had been presented to the bankruptcy court. As the bankruptcy court had not yet conducted a sale hearing, Goss retained discretion under the bidding procedures to reject any bid that it believed was not in the best interests of the estate and its creditors and to impose additional conditions on the sale of the property.

Confronted with these circumstances, the bankruptcy court did not abuse its discretion in deciding to permit a second auction and to confirm the sale of the Cedar Rapids assets to CAI based on the results of the second auction rather than the first. The bankruptcy court carefully weighed the relevant considerations and reasonably concluded that the prospect of additional remuneration for the

estate and its creditors outweighed concerns about the finality and regularity of the sale proceeding. As the court had not yet conducted a sale hearing when MBA made its upset bid, the interest in the finality of the sale had not yet ascended to a point demanding that a gross shortcoming in the first auction be shown in order to justify renewed bidding. Although the first auction had come to a close and none of the parties had expected bidding to resume, CAI's high bid had not been formally accepted, and Goss was still empowered to reject that bid and/or to burden it with additional conditions until such time as the court approved the sale to CAI. CAI's expectation that it had won the right to purchase the Cedar Rapids assets was therefore not without qualification. On these facts, the bankruptcy court was entitled to conclude that CAI's expectations as the high bidder, and the public interest in the finality of the sale proceedings, were not so solidified as to preclude a second auction. At the same time, the bankruptcy court rightfully was concerned that MBA's lack of foreknowledge about the excision of the early-removal provision from the asset purchase agreement had placed it at a disadvantage at the first auction. A second auction offered the means of redressing that inequity as well as securing a higher price on the Cedar Rapids assets for the estate. *See Muscongus Bay*, 597 F.2d at 12-13. CAI, of course, was able to and did participate in the second auction along with the other qualified bidders; so far as the record reveals, it was prejudiced only in the sense of having to pay more for the right to purchase the assets.

The bankruptcy court also acted within its discretion in denying CAI's administrative expense claim. This type of claim is a means of seeking priority reimbursement for "the actual, necessary costs and expenses of preserving the estate . . . . " 11 U.S.C. § 503(b)(1)(A). Generally speaking, "a claim will be afforded priority under § 503 if the debt both (1) 'arise[s] from a transaction with the debtor-in-

possession' and (2) is 'beneficial to the debtor-in-possession in the operation of the business.'" *In re Jartran, Inc.*, 732 F.2d 584, 587 (7th Cir. 1984) (quoting *In re Mammoth Mart, Inc.*, 536 F.2d 950, 954 (1st Cir. 1976)). This court has recognized that fundamental fairness may, in appropriate circumstances, demand that a party injured in some manner by the administration of the estate be compensated pursuant to section 503. *Yorke v. N.L.R.B.*, 709 F.2d 1138, 1143 (7th Cir. 1983) (citing, *inter alia*, *Reading Co. v. Brown*, 391 U.S. 471, 482-84, 88 S. Ct. 1759, 1765-66 (1968)). CAI's claim is premised on the notion that it was inappropriate for Goss to have asked for the second auction and for the bankruptcy court to have confirmed the results of that auction instead of the first. For the reasons we have already discussed, we do not believe that either Goss or the bankruptcy court committed any impropriety that might justify compensation to CAI pursuant to section 503.

## III.

Finding no abuse of discretion in the bankruptcy court's decision to confirm the sale to CAI based on the results of the second auction or in its denial of CAI's administrative expense claim, we AFFIRM the judgment. We commend the district and bankruptcy courts for their careful and thorough consideration of this case.

A true Copy:

> Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*